PITTSBURGH COAL CO. v. NORTHY.

1. Sales—Custom and Usage—Contracts
   In an action for the recovery of the contract price for coal sold and delivered, wherein defendant claimed recoupment for non-delivery of part of the coal sold and for defective coal delivered, it was not error to charge the jury that defendant could not recover for coal which deteriorated because of customary handling in transportation, but which he accepted under the contract.

2. Same—Place of Delivery—Contracts—Damages.
   Where the parties contemplated delivery at the defendant's dock, and the place of delivery was agreed upon generally as at Houghton, defendant was entitled to delivery at his dock, and could not be compelled to take coal of the plaintiff at a different place or a higher price than the parties intended to fix by the terms of the agreement.

3. Same—Damages—Mitigation.
   The court should have charged the jury that the law does not permit the seller to force the buyer to pay an advance, and the damages are determined by the difference between the contract price and the market price at the place of delivery.

4. Same—Performance—Excuses.
   Testimony by the defendant that he did not purchase local coal

at a given time, to supply a deficiency in the amount contracted for, because he did not then want it on account of being unable to then use the coal without additional expense, did not justify the court in leaving to the jury a question as to whether the defendant wanted the coal purchased from plaintiff.

5. CORPORATIONS — FOREIGN CORPORATIONS — COMPLIANCE WITH STATUTE.
    A foreign corporation doing business in the State is presumed to have complied with the statute, Act No. 34, Pub. Acts 1903.

6. SALES—PLACE OF CONTRACT—PRIVATE INTERNATIONAL LAW.
    In the case of a contract signed in Michigan by the buyer of a quantity of coal, and subject to the approval of the seller at its home office in Pennsylvania, the contract was a Pennsylvania contract, notwithstanding the attempted approval in Michigan by an agent who lacked the requisite authority

7. DAMAGES—LOST PROFITS—MITIGATION OF DAMAGES.
    It was not error to refuse a request to charge that defendant could recover the profits which he might have made, the request containing no reference to his duty to supply himself with other coal for that purpose within a reasonable time.

8. SALES—CONTRACTS—BREACH—EXCUSES FOR NONPERFORMANCE —CONSTRUCTION.
    Under the terms of a contract for the delivery of coal subject to delays occasioned by strikes, lockouts, unavoidable casualties, want of cars, or other causes beyond the control of the seller, performance was not excused by inadequate unloading facilities of the vendee known to the vendor.

9. SAME—CUSTOMS AND USAGES—EVIDENCE.
    A habit of the vendor is not competent evidence of a custom.

Error to Houghton; Streeter, J. Submitted October 21, 1909. (Docket No. 43.) Decided November 5, 1909.

Assumpsit by the Pittsburgh Coal Company against Henry Northy for goods sold and delivered. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Allen F. Rees*, for appellant.

*Ball & Ball*, for appellee.

OSTRANDER, J.   By the terms of the contract made by
the parties, defendant bought of the plaintiff, and plaintiff
agreed to furnish, 1,200 to 1,500 tons of coal, delivered
afloat at Houghton, at the price of $2.45 per ton.   The
grade of coal specified was 1¼ inch, thin vein, Youghio-
gheny lump.   It was to be delivered when ordered, and
the contract, which was dated May 24, 1905, expired No-
vember 1, 1905.   The contract contained this provision:

" Deliveries of coal shall be subject to delays occasioned
by strikes, lockouts, accidents and other unavoidable cas-
ualties in the operation of seller's mines, the want of car sup-
ply, the failure of the railway companies to deliver or place
cars at the mines for loading, or other causes beyond the
control of the seller."

Under date September 23, 1905, defendant made the
quantity of coal certain by his letter of that date, order-
ing 1,300 tons.   Defendant had a dock at Houghton, with
certain facilities for unloading coal, a fact which was
known to plaintiff, and later, probably on October 14,
1905, 937 tons and 600 pounds of coal in the schooner
Allegheny was delivered to defendant at the dock and
was unloaded.   Later defendant asked plaintiff to deliver
700 tons of contract coal, and was told by plaintiff that
only 400 tons were due to him.   No further delivery was
made or was tendered at defendant's dock.   An invoice
of the coal so delivered was forwarded, the amount of the
demand, less the lake freight, being $2,015.20, to which
was added insurance $8.06, making the total sum
$2,023.26.   January 22, 1906, the defendant paid on this
account $1,500.   The action is assumpsit, to recover the
balance claimed to be due to the plaintiff for the coal
which it delivered to the defendant; the declaration con-
taining the common counts only.   With his plea the de-
fendant gave notice that the coal was sold under a special
agreement in writing; that the plaintiff had failed to per-
form the contract on its part in the following particulars:

(1) It did not deliver 1,200 to 1,500 tons of the grade of
coal specified in the contract, but only the amount of coal

above stated, by reason of which the defendant was obliged to purchase coal elsewhere at a higher price than the contract price to supply the demands of his trade.

(2) That defendant was not able to purchase from others sufficient coal to make up the balance of the amount agreed to be furnished by the plaintiff, and was unable to supply all of his customers with coal of that quality and kind.

(3) That the coal furnished by the plaintiff was not of contract grade and quality, but was of an inferior grade and quality, and that defendant, after having sold some of it to his customers, was obliged to reduce the selling price because of the inferior kind and quality of the coal, and for the same reason customers would not purchase the coal at the price which defendant could have received if the coal had been of the contract kind and quality. By reason of the premises the defendant had been damaged, and would recoup his damages against the demand of the plaintiff.

Both with respect to the pleadings, and, it may be added here, with respect to the trial, the defendant has treated the contract as apportionable, and has not contested the right of plaintiff to recover for the coal delivered, at the contract price, if it was of the contract quality, subject to a reduction of its demand by the amount of damages suffered by defendant for failure to deliver the contract quantity.

The cause coming on to be tried before the court and a jury, and the facts hereinbefore stated having been admitted or established, plaintiff was permitted to introduce certain testimony in support of its theory that it had been prevented, by causes beyond its control (inability to secure water carriage for the coal), from making any further delivery, and had therefore substantially performed the contract. In this connection it was permitted to prove its efforts to induce defendant to accept delivery of 400 tons of coal at the railroad dock of the Copper Range Railroad Company in Houghton, from which dock the coal might have been, at considerable expense, carried in cars to defendant's dock by an existing side track or spur. Much of the testimony was admitted over the objections of defend-

ant, and many exceptions to the rulings of the court were taken. The specific objections have for the most part become unimportant in view of the charge of the court. It is a contention of appellant, however, that the testimony objected to was of a character likely to, and the verdict indicates that it did, influence the jury unfavorably to defendant with respect to the issues submitted to them. The court in the charge to the jury withdrew from their attention and consideration all issues except those now to be stated.

The court said to the jury:

"Now the Pittsburgh Coal Company, having contracted to deliver afloat, Houghton, has delivered 937 tons. Mr. Northy is entitled to have the 1,300 tons delivered at the agreed price. They have not done it. Now what damages is he entitled to on account of the failure of the company to deliver? Just such an amount as he has lost by that failure, and that is to be measured by the amount he would be required to pay, above the contract price, to obtain coal in the same position within a reasonable time after the coal company had failed to deliver the coal."

The jury returned a verdict for the plaintiff for $583.06 damages, for which sum a judgment was duly entered. It is said in the brief for appellee, and the computation is not challenged, that, assuming the bill for this coal to be due December 15, 1905 (it was sold on 60 days' time, and was delivered October 14th), and computing interest on the amount unpaid at 5 per cent. after that time, there was due to plaintiff at the time of the trial $606.46, indicating that the jury found the damages of the defendant to be $23.40. A large number of errors are assigned, and they are discussed in the brief of counsel for the appellant under six heads, the first four of which relate to rulings upon the admission of testimony offered by the plaintiff, the fifth to the refusal of the court to give defendant's requests to charge, and the sixth to the charge of the court as given.

Considering the errors assigned in the inverse order in which they are discussed in the briefs, attention is given, first, to errors assigned upon the charge of the court. We

are impressed that the jury could not have misinterpreted the meaning of the following language, used by the learned trial judge, after he had stated that defendant claimed the right to recover damages, because the coal was not of the contract quality, and because plaintiff had failed to deliver the contract quantity:

"Now, when parties enter into a contract—business men, farmers, working men, mechanics—the contract is always to be considered in the light of what is customary in that line of business, and a man may be perfectly competent to make a contract with regard to his own business because he knows the customs that pertain to his business. For instance, a man says he will work a day for you, and he works a certain number of hours, and the man refuses to pay him because he has not worked 24 hours, and the man says 24 hours is a day, you will say that is nonsense. When people make contracts in the coal business, the customs that have obtained in the coal business are part of that contract. I am taking a little more time about this because it may aid you in seeing why I leave no question about defects in the coal.

"The testimony in this case stands undisputed that, according to the custom of coal business, coal is shipped after having been run over screens at the mine of a certain size. What happens to the coal afterwards may be for the benefit of the receiver of the coal or the benefit of the shipper of the coal, as things may turn out, according to how far it is transported and how many times it is handled. These parties entered into the contract knowing that—both of them experienced in the coal business. Now the contract which was entered into was that the Pittsburgh Coal Company, to state it briefly, agreed to deliver to Mr. Northy, when ordered—that is, when ordered by Mr. Northy—1,200 to 1,500 tons of 1¼ inch thin vein lump coal, at a certain price delivered afloat, Houghton. Now I think it is a fair construction of the contract, and one that was considered by both the parties when they say 'delivered afloat, Houghton,' that if they had sent a boat and anchored it off the College of Mines, it would not have been a compliance with the contract. Although that would be in Houghton, I think both of them understood that the delivery was to be at Northy's dock; that is, that that was the place where the boat was to stop. It seems to me that it is the reasonable construction of that,

and the delivery of the amount delivered tends to show that that was where the boat was put.

"Now it seems when Mr. Northy ordered the coal, as he had a right to, between 1,200 and 1,500 tons, he ordered 1,300 tons, and the Pittsburgh Coal Company, through one of its agents or officers, or perhaps both agent and officer, accepted that offer, and the Pittsburgh Coal Company from that day until this suit has recognized, and by their letters recognize, a contract to deliver afloat, at Houghton, 1,300 tons of that coal as asked by Northy. They did deliver 937 tons. They have never delivered the balance, and before I say anything about the liability for the nondelivery, I will go back a little to the quality. As I said, both parties knew how the coal was graded according to size, at the mine, and what might happen from the shipment. It appears from the testimony of both that, when cargoes are received sometimes there is a greater amount of slack coal than others, and that is understood by both. Mr. Northy did write to these people at the time that he asked them to send 700 tons additional; that this cargo was not up to the usual quality. That is the statement he made to them, but he made no claim in that letter as being anything unusual, and I think it is only fair to say that constituted no element of damage, because the percentage of slack coal was about what it was sometimes. Under the undisputed testimony in this case, there is no testimony from which you can arrive at any estimate of any damages, and therefore I ask you to dismiss that branch of the case from your minds."

There is nothing in the instruction to support the idea that evidence of a trade custom can be admitted to vary the terms of an express agreement. Nor, when considered with the remainder of the charge, is it reasonable to suppose that the jury could have understood that the failure to deliver the contract quantity of coal was or could be excused by any custom.

As affecting the measure of defendant's recovery, the court was in error in advising the jury that the refusal of defendant to accept delivery of the remainder of the coal at the Copper Range docks, and the cost of conveying the coal from those docks to his own, might be considered as

affecting the measure of defendant's damages. We base this ruling upon the fact, which, as we understand the record, is supported by undisputed testimony, that the offer of the plaintiff to deliver the remainder of the coal at the Copper Range docks was an offer of delivery under the contract. We agree with the trial court in holding that the place of delivery of the coal contemplated by the parties to the contract was the dock of the defendant. On the part of the defendant the court was requested to charge:

"The plaintiff, the Pittsburgh Coal Company, cannot assert that the defendant, Northy, should have accepted coal over the Copper Range dock, and thereby lessen its damages which it was obliged to pay for failure to deliver coal at Northy's dock, as the law does not contemplate that a seller can force the buyer to pay an advance price before it will deliver the article, but the rule of damages is the difference between what the seller agreed to sell for and the price for which the buyer can obtain the article sold at the place where delivery should have been made."

The jury were instructed:

"It appears also that before the time of the expiration of the contract, the selling company had said: 'We can deliver the balance of the coal at Houghton if you can take it at the Copper Range dock.' I am not trying to give the words, but the substance of it. Mr. Northy's answer was, 'Impossible.' If it was impossible for him to take it there, the fact that the Pittsburgh Coal Company could deliver it there would make no difference. But if it were not impossible, if you find from the testimony that the coal could have been taken at the Copper Range dock, and then transported from there to the Northy dock in the usual way of handling freight of that kind, then that is evidence for you to consider with regard to the amount of damage that was done, suffered by Mr. Northy on account of the failure of the delivery of the coal."

And also:

"Now you will consider all this testimony on both sides fairly, and if you find that Northy could have had his coal order filled with the expense simply from the

Copper Range dock down to his dock, that is the measure of damages."

It is more than merely probable that the jury assessed the damages of defendant in accordance with this instruction. The requested instruction should have been given.

The court did not err in refusing to submit to the jury the question whether the coal delivered was of the quality specified in the contract. The defendant accepted the coal as contract coal, and there is no testimony tending to prove that it was not of the grade specified. The court said to the jury:

"Now, it is claimed on the part of the coal company, that there is testimony tending to show that Northy did not want any more coal at that time. From his letter, telegram, testimony on the stand here, you are to consider that as you consider all the rest. If he did not want any coal then, although they had not delivered the full amount, he did not suffer any damage. If he did want the coal then, then he is entitled to the difference between what they agreed to deliver the coal for and what it would have cost him to have had coal at that time in the same place here, and you should give him that amount."

After receiving a statement of account from plaintiff, the defendant, on December 18, 1905, wrote to plaintiff a letter, which was introduced in evidence, and which reads, in part, as follows:

"Your coal cost $2.75 [this included unloading cost] per ton. The price on cars on Pickands [a local] dock is $3.25 for run of pile and $3.50 for family coal, and ten cents freight, which will make a difference of sixty cents per ton to me. Deduct the amount from your bill will leave $1,685.46, if this is satisfactory, will send you draft for the amount as soon as I hear from you."

Defendant testified:

"When I wrote the letter of December 18th, I stated that the price on cars at Pickands dock was $3.75 per ton. That dock is across the lake. They raised the price to $4. I don't know when they did that. When I wrote the letter I could have got it for that price, but not $3.50 for

family coal. I suppose I could have got it from them at
that time for $3.25 and $3.50 for family coal, if I wanted
it, and 10 cents freight. That's what they charge on the
railroad company for bringing it over. I didn't want it at
that time. That time I didn't want it.  *  *  *

"Q. How much more above $3.25 and $3.50 per ton
and the 10 cents freight would you be obliged to pay for
transporting that coal from across the lake, and placing it
in your yard?

"A. At that time I didn't want it, and then afterwards
they raised the price of coal. I didn't want any coal at
that time. I had coal in my yard, and I didn't want it
at that time. I didn't want to buy coal when I had coal
in my yard, and before I wanted the coal, the price of
coal had gone up to $3.90.

"Q. Would it cost more to unload coal from cars into
your yard than that vessel?

"A. It depends entirely whether I wanted to use it or
not. I had to shovel it off from the cars into the wagons.
It depends entirely whether I had use for a car load or
not to shovel it off the cars to the wagon.

"Q. How much would it have cost you in October or
November, 1905, to transport 362 tons of coal from the
Portage Coal & Dock Company and stack it in your yard
in addition to the 10 cents freight?

"A. If I had to take it in my yard I would have to hoist
it up, and that would bring it double. It would cost in
addition 30 cents a ton. That would make it at the least
calculation 40 cents a ton difference. Forty or 50 cents a
ton, from the price they want in their yard, and they want
$3.25 in their yard. That would bring the price of coal
to $3.75 or $3.80 to take it and put it in my yard. That
includes the 10 cents freight."

We do not infer from this testimony that the defendant
meant that he was satisfied with the failure of plaintiff to
deliver the quantity of coal ordered. He was explaining
why he did not buy coal, for his wants, from a local con-
cern. Unless he could shovel from cars directly to his de-
livery wagons, it was necessary for him to go to additional
expense to hoist the coal from cars to his bins. Paying
the local price for coal, 40 cents per ton for freight and
hoisting, and 50 cents per ton for delivering — figures
which he gave of the cost of coal delivered—would ren-

der the business wholly unprofitable. The statement made by the court, in the connection in which it was made, was calculated to prejudice defendant.

The plaintiff's general agent testified that the plaintiff was a coal producing and shipping company, a corporation organized under the laws of New Jersey, and that it had not, to his knowledge, filed in Michigan the papers required by the statute of Michigan to authorize it to do business in the State, but that he could not state whether or not it had ever filed the necessary papers. It does not appear that plaintiff has any place of business in this State, or that it does any business therein, except in performance of contracts made in the State of Pennsylvania to deliver coal to purchasers within the State. The defendant requested the court to charge the jury, in substance, that for the reason indicated plaintiff was not entitled to bring this suit, and this the court, and we think correctly, refused to do. The contract between the parties was not a Michigan contract. It is true that the writing was made at Houghton by an agent of the plaintiff who was in Michigan for the purpose of making contracts in behalf of the plaintiff. It was signed at Houghton by the defendant and by the Pittsburgh Coal Company by the selling agent. It contains a provision: "This agreement is not effective until approved by home office." As a matter of fact, the selling agent who drew the contract wrote upon it, in Michigan, the words: "Approved. J. P. Walsh, General Manager of Sales." But it is made clear that he had no authority to approve the contract for the company, and that the contract was later ratified and approved and made effective by the plaintiff in Pennsylvania. By the terms of the statute (Act No. 34, Pub. Acts 1903):

"No foreign corporation, subject to the provisions of this act, shall maintain any action in this State upon any contract made by it in this State after the taking effect of this act, until it shall have fully complied with the requirements of this act, and procured a certificate to that effect from the secretary of State."

It was, in any event, unnecessary for plaintiff to allege compliance with the statute, and compliance, in fact, is presumed. *Prussian Nat. Ins. Co.* v. *Eisenhardt*, 153 Mich. 198 (116 N. W. 1097).

Error is assigned upon the refusal of the court to instruct the jury that:

" The uncontradicted testimony in this case shows that the plaintiff agreed to deliver to the defendant at Houghton, Mich., 1,300 tons of coal, and only delivered 937 tons 600 lbs., and it further appears that the defendant [plaintiff] has not excused his [its] failure to deliver the balance of said coal, namely 362 tons 1,400 lbs., in such a manner as the law recognizes, and I, therefore, charge you that as a matter of law the defendant is entitled to recover from the plaintiff in this suit, by way of recoupment, the profits he might have made on that 362 tons 1,400 lbs. You will give the defendant as damages, by way of recoupment for the plaintiff's failure to deliver the 362 tons 1,400 lbs. referred to, the difference between what the defendant could have sold that coal for and the cost to him, including unloading and delivery charges."

This manifestly is not the rule stated in one of defendant's requests to charge hereinbefore set out. It is admitted that the request does not state the general rule of damages for violation of a contract to deliver ordinary articles of merchandise at a designated time and place; but it is contended that, under the circumstances of the case, the rule suggested affords a proper measure of the compensation to which defendant was entitled. The circumstances pointed out in the brief are that defendant was a retail coal dealer at Houghton, delivering coal for family purposes and for steam purposes from his dock; that the market for coal by the cargo was at Cleveland and on the lower Lakes; that the court will take judicial notice that coal cannot be shipped to Lake Superior in the winter; that defendant ordered a particular kind of coal for a particular kind of trade, had a market for all the coal contracted for, and lost a definite amount of trade, measured by the shortage in the delivery at a definite price; that

the circumstances were known to plaintiff, the vendor, and that effect should be given to the testimony of the defendant: " After knowing that I was not going to get any more coal from the plaintiff, it was too late to get coal from any other company." The coal was sold to defendant to be sold again by him. There is some testimony tending to prove that defendant might have supplied himself with coal at once, or soon after plaintiff's alleged default. Defendant's letter of December 18, 1905, is, in effect, an admission upon his part that he could supply himself at an increased price of 60 cents per ton. The request to charge now being considered does not take into account the duty of defendant to have supplied himself with coal if such a course was reasonably possible. It was not error to refuse it.

As the case must go down for a new trial, we may very properly decline to discuss the probable effect of the testimony admitted, over plaintiff's objections, upon the jury. It is evident that plaintiff did not prove a custom with respect to the loading of vessels, the tonnage of which did not correspond with the quantity of coal sold to particular buyers, but only a habit or method of its own, entirely immaterial to the issues. The unloading facilities of defendant, known to plaintiff when the coal was sold, however inadequate they may have been for large vessels, was not a cause affecting nondelivery "beyond the control of the seller." We have already indicated that the offer to deliver coal at the Copper Range dock should not have been admitted to affect the measure of defendant's recovery. The record does not contain all of the testimony, and the materiality and effect of some of that introduced as supporting theories of plaintiff, which were rejected by the trial court, are not properly open for consideration.

The judgment is reversed, and a new trial granted.

GRANT, MONTGOMERY, MOORE, and McALVAY, JJ., concurred.