POWER SPECIALTY CO. *v.* MICHIGAN POWER CO.

1. CONSTITUTIONAL LAW—INTERSTATE COMMERCE—CONTRACTS—INTERSTATE BUSINESS—CORPORATIONS.

Where plaintiff agreed to sell and erect superheaters for defendant's boilers, and there was no testimony to indicate whether or not the work of installation could be done by local workmen engaged in this State, but plaintiff carried out the agreement as to two of the attachments which it installed and which failed to conform to the representations that plaintiff's salesman had made, by the terms of the contract, the same to be assembled by employees of plaintiff, and part of them to be connected before the boilers were bricked up, the agreement was not shown by sufficient evidence to be interstate commerce,

nor was there sufficient proof to establish that plaintiff was transacting business in Michigan in violation of the State statute requiring foreign corporations doing business here to obtain a license.

2. SAME—SALES.

The principal question was whether installing the superheaters was such an essential requisite to the sale that it could be said but for plaintiff's installing them it could make no sale; plaintiff failing to prove that the necessity of its installing the superheaters was a requisite of their sale, did not bring itself within the rule relating to commerce between the States, and, therefore, was not entitled to a verdict in its favor.

3. SAME—PLEADING—DECLARATION.

But it was not necessary to plead in the declaration the necessity of furnishing an engineer or other expert to install the machinery in order to effect a sale.

4. SAME—AFFIRMATIVE DEFENSE.

Under Circuit Court Rule 7 (e) as formerly in force, defendant was required to give notice that the contract was invalid under the statutes of Michigan.

Error to Ingham; Collingwood, J. Submitted January 13, 1916. (Docket No. 36.) Decided March 31, 1916.

Assumpsit by the Power Specialty Company, a foreign corporation, against the Michigan Power Company, a corporation, to recover the purchase price of certain superheaters. Judgment for plaintiff on a verdict directed by the court. Defendant brings error. Reversed.

*Oxtoby & Wilkinson*, for appellant.

*Cummins, Nichols & Rhoads*, for appellee.

STONE, C. J. This is an action of assumpsit by a New York corporation to recover the price of six superheaters which plaintiff had agreed to sell and erect in defendant's power plant at Lansing, Mich.

The principal office of the plaintiff is located in New York City. It is engaged in the manufacture and sale of an appliance known as the "Foster Superheater," designed to raise the temperature of steam used in power plants. This superheater consists of a number of pipes connected to other pipes called "headers," all erected inside of a steam boiler in such a way that the hot gases superheat the steam as the latter passes to the steam engines.

Prior to November 6, 1912, the defendant was engaged in generating and furnishing electricity and steam heat in the city of Lansing, and at that time had in its plant six "Wickes" vertical water tube boilers. It was about to add to its installation two more such boilers.

The various parts making up these superheaters were delivered by plaintiff to defendant, but were not erected, or set up by it, due, it is claimed, to defendant's refusal to allow plaintiff to do so.

The declaration in the first count sets forth the written contract sued upon, alleges that the plaintiff delivered to said defendant, at Lansing, two of said Foster superheaters, and erected the same in said defendant's plant at Lansing in accordance with said agreement, and defendant paid for the same; that afterwards, and on, to wit, the 1st day of April, 1913, in accordance with said contract, and at the request of said defendant, the plaintiff delivered to said defendant at Lansing the balance, or remainder of said Foster superheaters mentioned and described in said agreement, and said plaintiff then and there offered to erect, and is still ready and willing to erect, the said six remaining superheaters in said defendant's plant aforesaid in accordance with its agreement, but that said defendant did not, or would not, suffer the plaintiff to erect said remaining six superheaters in said defendant's plant, and avers that it has done and

performed all things by it to be done and performed under said contract, except as it has been wrongfully prevented by said defendant from doing. This count is followed by the common counts in assumpsit.

The bill of particulars of the plaintiff's demand is for the price of six Foster superheaters at $1,125 per heater, with interest at 6 per cent.

The plea was the general issue with notice:

(1) That said plaintiff was a foreign corporation, and at the time of the occurrence of the matters set forth in the declaration, and at the date of the alleged contract, had not complied with the provisions of the laws of Michigan with reference to foreign corporations, in that it had not procured from the secretary of State of Michigan a certificate of authority to carry on its business in the State of Michigan; that the contract declared upon not only contemplated that said plaintiff should manufacture, ship, and deliver the articles and things therein referred to, but also required and contemplated that plaintiff should erect the same in defendant's plant at Lansing, said contract providing for erection, brickwork, superintendence of erection and work thereon in connection with the installation of the superheaters referred to in said alleged contract; and that said contract was not valid because it was entered into by plaintiff in violation of the laws of the State of Michigan, and that it is unenforceable against the defendant.

(2) That said contract contemplated that said superheaters were to be installed and erected in certain boilers then in use, and in certain boilers to be thereafter erected at the defendant's plant; that certain of said superheaters were to be located in defendant's boilers then in use at its said plant and connected with the header pipes then in use by the defendant; that plaintiff's sales manager stated and represented to this defendant, before and at the time of the execution of

said alleged contract, that said superheaters would work satisfactorily in connection with the cast-iron fittings of the main header pipe then used by defendant in its plant; that no changes would have to be made by defendant in its use of the cast-iron fittings of its 10-inch steam header pipe by reason of the installation of said superheaters, and said sales manager represented to the officers of the defendant that he was experienced in the installation of said superheaters and economies resulting from the use thereof; that he had particular knowledge in such matters; that the defendant had had no experience with said superheaters and their use and effect, and in executing said contract believed and relied upon the statements and representations made to it by said sales manager, and that but for such statements and representations the defendant would not have entered into said alleged contract; that said two superheaters so installed by the plaintiff in defendant's two boilers did not work satisfactorily, and did not fulfill the guarantees contained in said alleged contract; that said two superheaters superheated the steam to about 150 degrees instead of from 90 to 110 degrees, resulting in the creation of dangerous conditions in defendant's 10-inch steam header pipe; that said excessive head made said header pipe expand and twist so as to become dangerous, and liable to break and destroy the lives of defendant's employees in its plant; that on one occasion said excessive superheat did cause a cast-iron fitting which formed a part of defendant's steam header pipe to burst, but fortunately, at a time when defendant's employees did not happen to be in the boiler room; that as a result of its bursting defendant's plant became filled with steam, making it necessary to shut down the machinery; that the said representations made by said agent and representative of said plaintiff were untrue and fraudu-

lent in law, and for this reason the said contract was and is void as to this defendant.

On November 6, 1912, plaintiff submitted to defendant its written proposition, which defendant accepted on the same date. The proposition and acceptance were as follows:

"Power Specialty Company, 111 Broadway, New York.
"Foster Superheater.
"Proposal and Specification.
"November 6, 1912.
"No. C—1244—A.
"To The Michigan Power Co.

"We propose to furnish and deliver eight Foster superheaters guaranteed to raise the temperature of 12,000 pounds of steam per hour containing not more than 1% moisture at a pressure of 150 pounds per square inch to 465 degrees Fahr., corresponding to a superheat of 100 degrees when erected and operated in accordance with conditions hereinafter stated.

"The superheater will be of our standard composite construction. It will consist of a series of straight elements connected to steel manifolds and return headers, or a series of return bend elements. The joints between the elements and the headers will be metal to metal obtained by expanding the ends of the elements into carefully reamed holes in accordance with the most approved practice to insure tightness and durability.

"The elements will consist of bodies of seamless cold drawn steel tubing, to the outside of which are snugly fitted series of annular gill flanges placed close to each other and forming an external covering of cast iron for the protection of the bodies against the action of the heated gases.

"These annular gills form an extension surface for the absorption of heat by the elements from the hot gases. They provide a section of great ultimate strength and absolute freedom from internal strains. They also provide a mass of metal which acts as a reservoir for heat to be imparted to the steam regularly and prevent fluctuations in the temperature of the hot gases from producing corresponding fluctuations in the superheat.

"In order to insure uniform distribution of steam throughout each element, and to effectually utilize all the heating surface, the elements are fitted with cylindrical cores of tubing closed at each end and centrally supported to provide a thin annular space for the passage of steam while receiving superheat.

"All parts of the superheater are easily accessible for inspection.

"The superheater will be designed for erection in eight 400 h. p. Wickes vertical water tube boilers, approximately as shown on accompanying blueprints No. MP4142.

"The arrangement is such that the hot gases will pass through superheater chamber and be brought closely in contact with superheater surface.

"The guarantee hereinabove made is based on the superheater being located and connected as shown in this drawing and the guaranteed superheat, if the superheaters are of the attached type, installed within the boilers, is to be obtained while the boilers are operating at their normal rated capacity, with feed water at 200 degrees F.

"It is understood that if the average superheat shown under full normal load is within 10 degrees of the amount stated on first page it will be considered as fulfillment of the guarantee.

"Delivery to be f. o. b. our works, Dansville, N. Y. Freight allowed to Lansing, Michigan, to suit customer's requirements.

"Shipment to be to suit customers' requirements, after approval of our drawings.

"Price for the above described apparatus: ($9,-000.00) nine thousand dollars, including: Operating instructions; thermometer; pipe connections from boiler to superheater and from superheater to a single outlet; doors for cleaning and inspection; supports. All fittings and flanges, unless otherwise specified, will be of semi-steel.

"Erection is included and brickwork.

"Superintendence erection is included.

"It is understood that erection contemplates continuous prosecution of work, and that all cost and expense of any interruption thereto caused by purchaser

shall be added to and become a part of the contract price to be paid by the purchaser.

"Insurance. A policy of insurance will be furnished with each superheater.

"Payment to be made in New York funds, seventy-five per cent. upon delivery, and the balance within sixty days after shipment, unless shipment is delayed by purchaser, in which case the first payment of seventy-five per cent. of contract price shall be made when material is ready for shipment, and the balance within thirty days after shipment. Deferred payments to bear 6% interest.

"This proposal, if accepted and approved, is contingent upon no strikes, fires or other delays, unavoidable or beyond our control occurring, and it is expressly understood that no promise or understandings not expressed in writing and attached to this proposal shall be considered.

"Power Specialty Company,
        "R. B. Nutting, Chicago Sales Manager.
"Accepted Nov. 6, 1912.
    "Michigan Power Co.,
        "D. W. Low, Gen. Mgr.
"Shipping Instructions:
"Via Del—over M. C. or Grand Trunk."

The plaintiff has at no time been licensed to do business in Michigan as a foreign corporation. It has never had an office in Michigan, and it has never had an agent in this State, except its traveling salesmen who travel through the State from its Chicago office, unless it may be said that the persons in its employ who erected and installed two of the superheaters in defendant's plant were its agents.

The superheaters involved in this case were fully manufactured and made ready for shipment at the plaintiff's manufacturing plant, located at Dansville, N. Y., and were shipped in a knocked down condition to the defendant's plant at Lansing, ready to be put together and installed. Plaintiff set up the superheaters in the two new boilers as they were being

erected. In other words, the superheaters in these boilers were assembled by plaintiff and connected up before the boilers were bricked up. No brickwork was to be done by the plaintiff on these boilers, it being necessary for it merely to install its superheaters as soon as the steel work of the boilers was completed. In order, however, to install the superheaters in the six old boilers it was necessary for plaintiff to tear out the brickwork in front, assemble and connect up in their proper places the pipes that made up the super-heaters, insert the doors at the proper place, tie the pipes so as to hold them in place securely, and then brick the boilers up again. The thickness of the brick wall surrounding the water tubes in the old boilers was about 18 inches. Owing to the space occupied by the superheaters when placed in position it was necessary, according to the plans, to make these brick walls in front of the superheaters thinner than the walls were before. In each boiler there were to be three doors set in frames, for the purpose of giving access for cleaning and inspection, which doors and frames were to be set up into the brickwork, and the brickwork (cylindrical before the heaters were installed) brought out square for a height of about two feet so as to form sides for the place where the doors were installed. The installation included these doors, and the frames in which they were placed and the base on each side of which a cross steel beam was supported. The super-heaters were held in place by lugs furnished by plain-tiff, which lugs were fastened to the upper boiler drum by bolts put into holes for that purpose. It might be necessary for plaintiff to buy some mortar and bricks at Lansing if the bricks taken out of the old boilers were not such that they could be used again, but the plaintiff did not contemplate buying any bricks.

There was evidence tending to show that the sales agent represented to the defendant's manager that

plaintiff's superheaters could be safely and properly installed in connection with the header pipe which defendant was then using, and he claimed that this statement was based on his experience, and knowing what plaintiff had done elsewhere. Said sales agent stated to the defendant's manager, as his opinion based on experience, that it was a good, safe practice to use cast-iron fittings in connection with superheated steam; that his knowledge was such as he had derived from experience in connection with sales and knowing what his company had done; that he told defendant's manager that it was unnecessary with steam at a pressure of 150 pounds per square inch and a superheat of 100 degrees, to replace defendant's cast-iron fittings with steel fittings on account of the use of superheated steam; and that it was perfectly safe to continue the use of cast-iron fittings with that steam pressure and that degree of superheat under the conditions which obtained in defendant's plant; that he also stated that defendant need have no apprehension whatever regarding continuing to use these cast-iron valves and fittings, in connection with the superheaters that plaintiff was to install; and that it was contemplated that the superheaters which plaintiff was to install in defendant's plant were to be used in connection with the header pipe which defendant was then using.

Other evidence was given tending to support the second division of defendant's notice under the general issue, and there was considerable testimony *pro* and *con* which we do not deem it advisable to here set forth. There was evidence to show that the various parts of the superheaters for the six old boilers were lying about defendant's plant stacked up at one end of the boiler room; that while defendant had paid for the two superheaters which had been put in, it was its claim that it would not permit plaintiff to erect the remaining six superheaters because it was unsafe to

use them in connection with its main header pipe as equipped with cast-iron fittings.

At the close of the defendant's case, the plaintiff moved for a directed verdict in its favor for the purchase price of the remaining six superheaters not installed, less what it would have cost to install them, and less credit for certain freight bills paid by defendant. Plaintiff coupled its motion for a directed verdict with a motion to strike out the evidence for the defendant so far as it related to the question of fraud, or the question of the operation of the boilers, of the impropriety of using cast iron, or installing superheaters in connection with cast iron, on the ground that there was no evidence tending to show any such defense.

The defendant also made a motion for a directed verdict for the defendant, on the ground that the evidence which had been put in, and which supplemented the contract which was offered in evidence, showed that the contract was entered into by the plaintiff in violation of the laws of the State of Michigan. Counsel said:

"My claim as to the invalidity of the contract applies both to the installation of the superheaters in the two new boilers which were then being installed, as well as to the installation of superheaters in the six old boilers. I submit, if the court please, that on both phases of the contract, taking them separately or taking them together, the contract was entered into by the plaintiff in violation of the laws of the State of Michigan."

He further urged that upon the testimony it was the duty of the court to submit to the jury the question whether or not the statements and representations made by plaintiff's sales agent to defendant's manager were, or were not, such that he had a right to rely upon them; were, or were not, such as to amount to fraud in law, and as to whether the contract was a

valid and binding contract between the parties in view of the testimony of defendant's manager, that in entering into the contract he believed from the salesman's representations that it was good practice to install the superheaters in connection with the steam header pipe which the company was then using, and which was equipped with cast-iron fittings.

The trial court overruled defendant's motion for a direction of verdict in its favor, and granted plaintiff's motion, holding that there had been no evidence produced to show fraud in the inception of the contract, and that the contract as it stood was a good contract; to both of which rulings defendant duly excepted. Whereupon the court directed a verdict for the plaintiff in the sum of $6,466.17.

Defendant has brought the case here for review. By appropriate assignments of error two questions are involved:

(1) It is the claim of defendant that the contract of November 6, 1912, by which plaintiff agreed to furnish, deliver, and erect eight superheaters in defendant's boilers at Lansing, was a contract requiring the transaction of business within the State of Michigan, and, as plaintiff admittedly failed to comply with the provisions of law relative to foreign corporations, the contract was illegal and void, and plaintiff cannot maintain an action thereon.

(2) It is also the claim of defendant that there was sufficient evidence of fraudulent representations made by plaintiff to defendant in the inducement to the contract to warrant the submission of the question to the jury, and that the court erred in ruling to the contrary at the close of defendant's case, and directing a verdict for the plaintiff.

1. In support of defendant's contention upon the first point, counsel cite the following authorities: *Haughton Elevator, etc., Co.* v. *Candy Co.*, 156 Mich.

25 (120 N. W. 18); *Imperial Curtain Co.* v. *Jacob,*, 163 Mich. 72 (127 N. W. 772); *Nernst Lamp Co.* v. *Conrad,* 165 Mich. 604 (131 N. W. 120); *Lange Medical Co.* v. *Brace,* 186 Mich. 453 (152 N. W. 1026); *Standard Fashion Co.* v. *Cummings,* 187 Mich. 196 (153 N. W. 814).

In recognition of the rule that the question of what is interstate commerce is a Federal question, defendant's counsel rely largely upon the case of *Browning* v. *City of Waycross,* 233 U. S. 16 (34 Sup. Ct. 578). This case is referred to as containing the latest statement made by the United States Supreme Court, of what constitutes intrastate and interstate commerce. In that case Browning, plaintiff in error, was charged with violating a municipal ordinance which imposed an annual occupation tax of $25 upon "lightning rod agents or dealers engaged in putting up or erecting lightning rods within the corporate limits" of the city of Waycross, Ga. Browning claimed that he was the agent of a St. Louis, Mo., corporation on whose behalf he had solicited orders for the sale of lightning rods; that he had received the rods when shipped on such order from St. Louis, and had erected them for the corporation. The price paid for the rods to the corporation included the duty to erect them without further charge. He asserted that this constituted the carrying on of interstate commerce, which the city could not constitutionally tax. The Supreme Court of the United States held that Browning's business of erecting lightning rods within the corporate limits of Waycross as the agent of the nonresident manufacturer on whose behalf Browning had solicited orders for the sale of such rods, and from whom he had received the rods when shipped into the State of Georgia 🟊 such orders, might be subjected to the municipal license tax without violating the commerce clause of the Federal Constitution, although the contracts under

which the rods were shipped bound the seller, at his own expense, to attach them to the houses of the persons who ordered them. Chief Justice White, in the opinion, said:

"The sole question, therefore, here is whether carrying on the business of erecting lightning rods in the State under the conditions established, was interstate commerce beyond the power of the State to regulate or directly burden. The solution of the inquiry will, we think, be most readily reached by briefly reviewing a few of the more recently decided cases which are relied upon to establish that although the interstate transit of the lightning rods had terminated and they had been delivered at the point of destination to the agent of the seller, the business of subsequently attaching them to the houses, for which they were intended, constituted the carrying on of interstate commerce. The cases relied on are *Caldwell* v. *North Carolina*, 187 U. S. 622 [23 Sup. Ct. 229, 47 L. Ed. 336]; *Rearick* v. *Pennsylvania*, 203 U. S. 507 [27 Sup. Ct. 159, 51 L. Ed. 295]; *Dozier* v. *Alabama*, 218 U. S. 124 [30 Sup. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264]."

The court, after considering the cases cited and distinguishing them, said:

"It is evident that these cases when rightly considered, instead of sustaining, serve to refute, the claim of protection under the interstate commerce clause which is here relied upon since the cases were concerned only with merchandise which had moved in interstate commerce and where the transactions which it was asserted amounted to the doing of local business consisted only of acts concerning interstate commerce goods, dissociated from any attempt to connect them with or make them a part in the State of property which had not and could not have been the subject of interstate commerce. Thus, in *Caldwell* v. *North Carolina*, the court laid emphasis upon the fact that the shipment of the pictures in interstate commerce in one package and the frames in another was not essential, but accidental, for the two could have been united at

the point of shipment before interstate commerce began as well as be brought together after delivery at the point of destination. And this was also the condition in the *Rearick Case*. Indeed, it is apparent in all three cases that there was not the slightest purpose to enlarge the scope of interstate commerce so as to cause it to embrace acts and transactions theretofore confessedly local, but simply to prevent the recognized local limitations from being used to put the conceded interstate commerce power in a strait-jacket so as to destroy the possibilities of its being adapted to meet mere changes in the form by which business of an inherently interstate commerce character could be carried on.

"We are of the opinion that the court below was right in holding that the business of erecting lightning rods under the circumstances disclosed, was within the regulating power of the State and not the subject of interstate commerce for the following reasons: (*a*) Because the affixing of lightning rods to houses was the carrying on of a business of a strictly local character, peculiarly within the exclusive control of State authority. (*b*) Because, besides, such business was wholly separate from interstate commerce, involved no question of the delivery of property shipped in interstate commerce or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated. It is true, that it was shown that the contract under which the rods were shipped bound the seller, at his own expense, to attach the rods to the houses of the persons who ordered rods, but it was not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to State control, into an interstate commerce business protected by the commerce clause. It is manifest that if the right here asserted were recognized or the power to accomplish by contract what is here claimed, were to be upheld, all lines of demarkation between National and State authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one State to the other and intended to be used after delivery in the construction of buildings or in

the making of improvements in any form would or could be made interstate commerce.

"Of course we are not called upon here to consider how far interstate commerce might be held to continue to apply to an article shipped from one State to another, after delivery and up to and including the time when the article was put together or made operative in the place of destination in a case where because of some intrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction. In saying this we are not unmindful of the fact that some suggestion is here made that the putting up of the lightning rods after delivery by the agent of the seller was so vital and so essential as to render it impossible to contract without an agreement to that effect, a suggestion however which we deem it unnecessary to do more than mention in order to refute it."

In *Hastings Industrial Co.* v. *Moran,* 143 Mich. 679 (107 N. W. 706), this court held that the contract there clearly contemplated and included something more than interstate commerce; and that, we think, is the vital question here.

In discussing the *Browning Case* counsel for the plaintiff claim that it presented a case of "repeated sales." This is probably true, but this court held in the *Haughton Elevator Case, supra,* that a "single transaction, if local business, is within the prohibition of the statute."

It would seem that the decision in *Browning* v. *City of Waycross* contains a very clear definition of what constitutes interstate commerce, and what intrastate commerce. While in that case the court was considering the validity of an ordinance taxing lightning rod agents, it decided the case, not upon the theory that Browning was carrying on a business or doing a series of acts, but upon the theory that when material is shipped from one State into another and there installed, such act is intrastate commerce, unless it can

be claimed that the case falls within the exception, viz.:

"After delivery and up to and including the time when the article was put together or made operative in the place of destination in a case where because of some instrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction."

It is asserted by counsel for appellee that "it is a very long jump from lightning rods to superheaters," and that these superheaters were manifestly not simple appliances which defendant might readily have installed, or have had installed by local workmen. We have examined this record with great care and have been unable to find any testimony in support of this statement. We are constrained to say that plaintiff failed to show by evidence whether or not purchasers might, or might not, themselves readily install these superheaters, or have them installed by other local workmen. On the other hand, it is asserted by appellant that mechanics and engineers could be found in the city of Lansing competent to install these superheaters, and that the installing of them was a far less complicated piece of work than the installing of a steam or hot water heating system in an ordinary house. There is no evidence upon that subject.

We think the vital question upon this point is whether the installing of these superheaters by plaintiff was such an essential requisite to the sale of them that it can be said that but for the installation by the plaintiff it could make no sale. The reading of this record demonstrates what counsel on both sides have asserted—that at the trial they had not before them the case of *Browning* v. *City of Waycross*. It is very evident that the principle of that case was not present in the minds of counsel in the examination of wit-

nesses along this line. It is possible that upon a new trial there may be evidence *pro* and *con* upon this question, and it may become one of fact to be submitted under proper instructions by the court. We think that the plaintiff has failed to show the necessity of itself installing these superheaters as an essential requisite to the sale of them. �'If such were the case, then, clearly, the State could not hamper or place it in a strait-jacket so as to destroy the possibility of itself doing business of an inherently interstate commerce character.

Counsel for plaintiff have called our attention to *Davis* v. *Commonwealth of Virginia,* 236 U. S. 697 (35 Sup. Ct. 479), wherein Mr. Justice Holmes said:

"It often has been pointed out that commerce among the States is a practical not a technical conception" —citing the *Browning Case.*

We think that the question we are here dealing with is a practical one and one founded in reason.

We cannot see that, whether the thing sold is stock or material from which a structure or a machine is to be made, or is the structure or machine itself, can make any difference as to its interstate character.

In the case of *York Manfg. Co.* v. *Colley* (172 S. W. 206), the court of civil appeals of Texas, after quoting the language from the *Browning Case* which we have referred to, said:

"This language suggests that the court may recognize exceptions in cases in which the facts show agreements to supervise the erection or to erect machinery of such a complex character that the sale thereof is impossible, unless such agreement is made. But if such exceptions are recognized by that high court, and must therefore be permitted by the State courts, the facts creating same ought to be alleged and proven. When a foreign corporation is not content with the privilege of having its agents come into this State and take orders for its goods, ship same to our citizens,

and collect therefor in our courts, but contends that it has the further right to transact the business of installing machinery sold by it, so as to connect it with, and make it a part of, the property in this State which was not the subject of interstate commerce, the burden certainly rests upon it of showing that, if it be prohibited from transacting such local business, such prohibition will, on account of the complex character of its machinery, affect the sale thereof to such an extent as to be a restriction or regulation of its right to sell such machinery. In this case appellant has not pleaded or proved that the contract to install or to furnish an engineer was necessary to enable it to make the sale to appellees."

It is urged here by counsel for appellant that the declaration in this case should have alleged such necessity, and the plaintiff should have proved it upon the trial. Under our practice we do not think that such allegation is necessary in the declaration. *Pittsburgh Coal Co.* v. *Northy,* 158 Mich. 530-541 (123 N. W. 47), citing *Prussian National Insurance Co.* v. *Eisenhardt,* 153 Mich. 198 (116 N. W. 1097).

Under subdivision *"c"* of former Circuit Court Rule 7, it is provided that:

"Whenever it shall be claimed in defense that any written instrument set forth in the plaintiff's declaration is void or voidable, or cannot be recovered upon by reason of any statute, * * * the facts upon which such defense is based shall be set forth in a notice added to the defendant's plea."

The giving of such notice by defendant has been the practice in this State. *Neyens* v. *Worthington,* 150 Mich. 580 (114 N. W. 404, 18 L. R. A. [N. S.] 142; *Lange Medical Co.* v. *Brace, supra.*

There is certainly a necessity for evidence as indicated above to bring a case within the interstate commerce rule. This renders it necessary for us to send the case back for a new trial.

2. Upon the question of fraudulent representations, we are not prepared to say in the condition in which the record appears, that the trial court committed any error in striking out the evidence upon that subject. We have looked in vain for any evidence showing a rescission or disaffirmance of the contract, and there is no claim for recoupment. It is the claim of defendant that the letter written on April 24, 1913, by the general manager of the defendant company to the plaintiff, was evidence of a rescission of the contract. We cannot so construe that letter, and we have been unable to find any evidence to support the allegation of the rescission of the contract, unless the refusal to allow installation amounted to a rescission, and this may have been a mere breach of the contract. These matters may be remedied upon a new trial, and we only refer to them because of the peculiar state of the record upon the subject.

We recognize the rule contended for by defendant's counsel, that it is not necessary in order to constitute fraud that a person making the statement should either know that it is untrue, or be recklessly and consciously ignorant of whether it be true or untrue, but it is sufficient if the representation be false in fact, and the person making it is a party to the contract and profits by the other's loss. This doctrine is clearly asserted in *Aldrich* v. *Scribner*, 154 Mich. 23 (117 N. W. 581, 18 L. R. A. [N. S.] 379) ; *Yanelli* v. *Littlejohn*, 172 Mich. 91 (137 N. W. 723) ; *Hubbard* v. *Oliver*, 173 Mich. 337 (139 N. W. 77).

For the error pointed out the judgment of the circuit court is reversed, and a new trial granted.

KUHN, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred. OSTRANDER, J., did not sit.