## MICHIGAN LUBRICATOR CO. v. ONTARIO CARTRIDGE CO., Limited.

(Circuit Court of Appeals, Sixth Circuit. October 5, 1921.)

No. 3508.

1. **Corporations ⊂⊃661(2)—Michigan statutes forbid recovery by foreign corporation under contract contemplating performance of its part in state.**

Comp. Laws Mich. 1915, §§ 9063, 9068, 12370, providing that foreign corporations, before doing business in the state, shall comply with certain requirements, forbid recovery under a contract which contemplates that the foreign corporation shall perform its part within the state, though such corporation is not doing business in the state at the time of the making of the contract.

2. **Corporations ⊂⊃642(1)—Foreign corporation, contracting for manufacture in Michigan of certain articles, held not "doing business" in state.**

Where a foreign corporation entered into a contract with a Michigan company, whereby the domestic company was to manufacture brass parts for primers, which were to be completely assembled and loaded by the foreign corporation in Ontario, and then to be sold to another company, such foreign corporation was not "doing business" within the state, so as to require it to obtain a certificate under Comp. Laws Mich. 1915, §§ 9063, 9068, 12370, though it furnished an inspector or "production man" for the domestic company's plant, and its officers lived in Michigan and made executive decisions there.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

3. **Sales ⊂⊃89—Manufacturer held to have broken contract to manufacture primers according to specifications, notwithstanding modification of contract.**

Where defendant manufacturing company agreed to manufacture primers "to conform to the Russian government's specifications and requirements, typewritten copies being attached to the order," and it was agreed between the parties that defendant could use brass containing lead on defendant's assurance and guaranty that the primers would not expand, but defendant failed to furnish primers which would not expand, because of the presence of the lead therein, *held*, that the contract was broken by defendant.

4. **Sales ⊂⊃416(2)—Evidence as to cost of obtaining substitute held admissible, when offered.**

In an action for damages for failure of defendant manufacturer to deliver primers, court did not err in admitting in evidence the cost of obtaining primers from other manufacturers on defendant's default, where it did not appear at the time the evidence was offered that the material used by the other manufacturers was different from that specified in defendant's contract, or that the process employed by them might not have been used by defendant with its specified material, so as to make good its guaranty of performance.

5. **Sales ⊂⊃416(2)—Not pertinent that purchaser would have sustained loss on resale.**

In an action for damages for failure to manufacture and deliver primers to be used in shells, on the theory of the difference between the contract price and the market price at the time of breach, defendant was not entitled to show that, if delivery had been made, plaintiff would have had no market for the articles and would have sustained a loss thereon.

6. **Trial ⊂⊃343—Finding in favor of plaintiff implied finding against defendant on cross-action.**

In an action for damages for breach of contract, where defendant claimed that a new contract was substituted for the one sued on, and that there

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was a breach thereof by the plaintiff, a finding by the jury of substantial damages in favor of plaintiff amounted to a finding against defendant on the issue as to the alleged substituted contract.

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by the Ontario Cartridge Company, Limited, against the Michigan Lubricator Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Paul B. Moody, of Detroit, Mich. (Corliss, Leete & Moody, of Detroit, Mich., on the brief), for plaintiff in error.

Justin R. Whiting, of Detroit, Mich. (Warren, Cady, Hill & Hamblen, of Detroit, Mich., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. In September, 1915, the Ontario Cartridge Company, an Ontario corporation, as purchaser, and the Michigan Lubricator Company, a Michigan corporation, as manufacturer and vendor, entered into a contract for the manufacture and sale of a large quantity of brass parts for primers, which were then to be completely assembled and loaded by the Ontario Company, and then to be sold to the Eddystone Company, and by it used in its business of making artillery shells for the Russian government. The contract was not carried out—no complete parts (except for test) having ever been delivered. The Ontario Company (hereafter called plaintiff) brought this action in the court below to recover its advance payment and to get damages for nonperformance; verdict and judgment in its favor were rendered; and the Michigan Company (hereafter called defendant) alleges error.

[1, 2] 1. Was the plaintiff "doing business" in Michigan, and thus barred from this action, because it did not possess the necessary certificate? The Michigan statutes direct that a foreign corporation, doing business in Michigan, shall comply with certain requirements and receive a certificate showing its performance thereof, and prescribe that no action shall be maintained by it on any contract made by it in the state while it is in default for lack of such compliance and certificate. C. L. 1915, §§ 9063, 9068, 12370. Plaintiff, clearly, was not doing business in Michigan before and at the time of making the contract in suit, as it had then done no business anywhere, and this contract is thus not within the letter of the prohibition; but the Michigan courts have accepted the statutes as invalidating and forbidding recovery under a contract which contemplated that the foreign corporation should perform its part within Michigan (Haughton Co. v. Candy Co., 156 Mich. 25, 120 N. W. 18; Imperial Co. v. Jacobs, 163 Mich. 72, 127 N. W. 772), and we accept this construction. Plaintiff's articles fixed its place of business at Walkerville, Ontario, across the river from Detroit. It had there leased a building for assembling purposes, and the contract between plaintiff and defendant called for the manufacture of these parts by the defendant at Detroit, and their delivery by defendant to plaintiff at Walkerville. Nothing was to be done by the plaintiff in Michigan, except to inspect at defendant's factory.

It is only the unusual situation, in some details, which gives color to defendant's theory of bar under this statute. Plaintiff's officers and managers lived in Detroit, and were chiefly engaged in conducting a Detroit manufacturing business. The contract was negotiated by them with defendant, in Detroit, and was there signed, advance payment was made from a bank deposit which plaintiff had in Detroit, and, as the matter went along and defendant's manufacturing difficulties developed, the consultations between the parties as to what should be done were held, and the conclusions of plaintiff's officers were announced, at Detroit. One of plaintiff's agents spent most of his time at defendant's factory, advising and assisting defendant in its troubles, acting, as he says, as "production man" for plaintiff. Until some parts were made under this contract and ready for assembling, plaintiff did nothing actively and actually at Walkerville, except to possess its factory expectant and keep a bank account; indeed, it did no substantial business, except to take its contract from the Eddystone Company and give this contract to defendant and lease its factory.

It is not easy to see how a contract, valid when made, has become invalid because unexpected developments have led the foreign corporation to be more active within the state than it had intended; but, however that may be, we think the recited circumstances did not, severally or cumulatively, tend to show that "doing business" which the statute forbids. Making the parts in Detroit was the defendant's business, not the plaintiff's; and whatever was actually done by plaintiff within the state was collateral or incidental to the purchase by the Canadian corporation of property to be shipped to it in Canada. The presence of foreign commerce is the dominant characteristic of the transaction, and, in its expected consummation, the preparatory domestic details are merged.[1] It is the clear inference from the decided cases to be cited that the furnishing of an inspector or "production man" does not infringe the statute. To make executive decisions in the state where the officers live is not to do business within that state. Empire Co. v. Lyons (C. C. A. 6) 257 Fed. 890, 892, 169 C. C. A. 40, and cases cited. Numerous decisions, in the Supreme Court of Michigan, the Supreme Court of the United States, and this court, lead, we think, to our stated conclusion. International Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Browning v. Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828; Standard Co. v. Cummings, 187 Mich. 196, 153 N. W. 814, L. R. A. 1916F, 329, Ann. Cas. 1916E, 413; Power Specialty Co. v. Power Co., 190 Mich. 699, 710, 157 N. W. 408, and cases cited; Hayes Co. v. American Co. (C. C. A. 6) 257 Fed. 881, 888, 169 C. C. A. 31; Empire Co. v. Lyons (C. C. A. 6) supra. It follows that the trial court was right in declining to submit to the jury the question of whether the plaintiff was in default under the foreign corporation statutes.

[3] 2. Which party broke the contract? The trial court held that,

---

[1] See Dahnke-Walker Co. v. Bondurant, 256 U. S. ——, 42 Sup. Ct. 106, 66 L. Ed. ——, and Eureka Co. v. Hallanan, 256 U. S. ——, 42 Sup. Ct. 101, 66 L. Ed. ——.

as matter of law, the defendant was at fault, and directed a verdict for the plaintiff. This leads us to the matter of construction. The contract (in the form of an order and acceptance) specifies that the parts were to be made "to conform to the Russian government's specifications and requirements, typewritten copies being attached to the order." One of the requirements thus incorporated consisted of detailed specifications of the firing test which must be passed, and one of these details was that, after firing, the primer must be easily removable from the cartridge case, in the manner particularized, so that the case might be used again with another primer. This amounted to saying that, in firing, the primer must not expand so as to hold itself too firmly in the inclosing cartridge shell. There was a sharp issue of fact as to whether these Russian government specifications and requirements were in fact attached to the order, or otherwise simultaneously brought to the knowledge of defendant, and such instructions to the jury were given that its finding for the plaintiff implies an affirmative finding on this question. It must therefore be assumed that the firing test specifications were, in effect, attached to the contract as executed by defendant.

It was taken as a fact upon the trial, not substantially questioned, that the primers, which were assembled by plaintiff from the parts made by defendant and delivered for test, did not successfully pass the ordeal, and that they expanded too much because the metal was too soft; and so we arrive at the controlling question. The order, as first tendered by plaintiff to defendant, provided that the brass, from which the parts were to be made, should contain no lead. Defendant insisted that such brass would be too hard to be successfully machined as contemplated, and represented that the rolling mills would furnish a brass rod containing from 1¼ to 1¾ per cent. of lead, and would guarantee it to be satisfactory, and that the defendant would therefore guarantee such material to be suitable. Plaintiff consulted with its customer, which consented to this change, and defendant was so informed. Thereupon the order proffered was accepted in writing by defendant, containing, in addition to the above-recited requirement of conformity to the Russian tests, the following:

"The rod to contain the following ingredients: 66 to 68 per cent. copper, 30¼ to 32¾ per cent. zinc, 1¼ to 1¾ per cent. lead, and to stand the following physical tests: Yield—12 British tons; breaking—20 British tons; elongation—30 British tons. You are to guarantee that this rod will pass the tests of the Russian government, and shall be of a quality and condition to close without fracture over the disc as shown in the assembly print attached hereto."

If it could be assumed that primer parts made of the specified material could not pass the test, no matter how manufactured, and that both parties knew or should have known it, there would be such repugnancy between the specification of material and the guaranty of performance as to bring confusion; but there is nothing to indicate that either party knew of this contingent repugnancy, or to show that there was no process of manufacture open to defendant which would have insured passing the test. Indeed, there was nothing to show that the satisfactory primer parts later made by others contained any different

raw material; and the inference seems open that an additional manu-facturing process to those used by defendant—namely, preliminary forging or equivalent condensation—would have solved the difficulty. Under these circumstances, we think the conclusion inevitable that de-fendant deliberately assumed whatever risk there was that the use of the specified material would lead to rejection upon the firing test.

Though both plaintiff and the plaintiff's customer agreed to this material, they did so, not absolutely, but only when their consent was coupled with defendant's guaranty of ultimate performance. Defend-ant was an experienced and successful worker in brass and of ample pecuniary responsibility. It was known to all parties that the com-pleted primers must not be too soft, and that the firing tests were the final criterion to be applied by the Russian government to the ultimate product. We see no consideration which would justify the elimina-tion from the contract of the defendant's guaranty, or the confining of that guaranty to the meeting of a part of the tests and requirements instead of extending to all of them; and, unless this guaranty is so elim-inated or confined, it is clear that the defendant, in effect, abandoned any attempt to perform.

3. *The Measure of Damages.*—As soon as it was apparent that no material was available, which defendant would undertake to use under its contract and which would make primers which would pass the test, plaintiff undertook to get satisfactory parts made elsewhere. The contract price per set was about 14 cents. Another manufacturer was making acceptable primers for the same ultimate use, but apparent-ly from a harder material and at a greater manufacturing cost, and its price was 35 cents per set. Plaintiff eventually found a manufacturer who contracted to make the parts, meeting the Russian specifications and tests, for about 21 cents per set. It is true this price was to rise or fall with the market price of copper, but it appears that, during the period when the contract would have been filed, copper was constantly rising in price. Hence it seems that defendant cannot complain if this contract is given the same force in fixing the measure of damages as if it had been a definite contract for 21 cents. Based on this proof, plaintiff claimed its damages to be measured by the difference between the contract price and this price, which it was compelled to pay in order to get the specified parts. The jury's verdict was necessarily based on this theory, although it allowed damages much less than this evidence would indicate.

[4] Defendant's objections to this measure of damages are two: First, that the 21-cent price was for a substantially different article; and, second, that the plaintiff did not buy any substantial quantity of the 21-cent article, but that, on the contrary, the plaintiff's contract with its customer was canceled by the customer with the plaintiff's consent or acquiescence, and that the plaintiff was, for that and other reasons, left without any market for the article.

As to the first of these points, it is raised only by objection to the admission of evidence of the contract with the new manufacturer, upon the ground that it pertained to a different article. The court ad-mitted the evidence, because it tended to establish the measure of dam-

ages. In this ruling, the court was right. It did not, at that point, appear that the raw material to be used was different from that specified in defendant's contract, or that the process of forging which was employed by the new manufacturer might not have been used by defendant with its specified material, so as to make good its guaranty of performance. In the absence of such proof, it would have been error to reject this evidence. If, when the case was closed, it was thought that the whole evidence so failed to show equivalency between the old material and the new that there was no sufficient proof of any measure of damage to go to the jury, the question could have been raised by motion to instruct for the defendant on that ground; but no such motion was made. There was a general request to instruct a verdict for defendant; but this was necessarily denied, because, upon the theory that the defendant broke the contract, plaintiff was entitled to a verdict at least for a return of the advance payment.

[5] As to the second point, it seems to appear that, some time after deliveries under the contract should have been completed, and after plaintiff had placed its order at the new price with another manufacturer, plaintiff's contract with the Eddystone Company, its purchaser, was canceled and the whole enterprise was abandoned. This would be a defense requiring serious consideration, if the action were directly for breach of warranty or to recover the profits which plaintiff had lost. The declaration had counts upon the theory of lost profits; but, upon the trial, these counts were abandoned, and the plaintiff sought to recover only upon the theory of the difference between the contract price and the market price at the time of breach. The defendant's warranty and its breach were involved only collaterally, in determining who was at fault for the nondelivery. This being the nature of the action, we see no pertinence in the fact, if it is a fact, that plaintiff would have had no market for the articles completed and delivered under the contract, but would, in truth, have made a loss. The situation is the same in principle as if the market price at the time of the breach was greater than the contract price, while afterwards, and before the purchaser actually buys again upon the market, the market price falls below the contract price, and the purchaser never does purchase elsewhere.

In such an action, it is no concern of the defaulting vendor whether the purchaser would eventually have made a loss or a profit, or whether he does or does not buy the articles elsewhere. Mechem on Sales, § 1738; 3 Sutherland on Damages (3d Ed.) § 699; Rockford Wks. v. Tilden, 188 Mich. 80, 83, 154 N. W. 35; Follansbee v. Adams, 86 Ill. 13. Further, in this case, no one knows that, if the primer parts had been made and delivered promptly under the contract, plaintiff might not then have successfully completed its sale to its customer; and no one knows that, in case of manufacture and delivery under the contract, plaintiff could not have kept the primers until the difficulties with the Russian government contracts, then thought to be temporary, were adjusted, or could not have kept them and used them in making ammunition for some other government.

[6] 4. *The Defendant's Cross-Action.*—Defendant claimed that a

new contract was substituted for the old one, by which new contract it was to make the primer parts out of other materials and for another price, and claimed damages for breach of this contract. The issue of fact as to the making of such new contract was submitted to the jury, and its finding of substantial damages, in addition to the sum of the advance payment, amounts to a finding against the defendant on that issue. The matters argued with reference to the rights of the parties under the new contract thereby became immaterial.

Several other errors are alleged in subordinate matters, but we find nothing creating substantial prejudice.

The judgment must be affirmed.