E. A. LANGE MEDICAL CO. *v.* BRACE.

1. CONSTITUTIONAL LAW—INTERSTATE COMMERCE—CORPORATIONS—
   AUTHORITY TO TRANSACT BUSINESS.
   A foreign corporation engaged in the business of selling
   proprietary medicines, extracts, and other merchandise,
   having a resident agent, employed under a contract to
   take orders for the products of the defendant company,
   who was to devote his entire time to the business, re-
   taining for his compensation a stated portion of the sell-
   ing price, under the further stipulation that the title to
   the goods should remain in the seller, was not engaged
   in the business of interstate commerce under Act No. 310,
   Pub. Acts 1907 (4 How. Stat. [2d Ed.] § 9647 *et seq.*),
   but was doing business within the State such as to re-
   quire it to obtain authority from the secretary of State.[1]

2. SAME—CONTRACTS—CONFLICT OF LAWS—SITUS.
   Sales made by an agent in his own name of goods to
   which title rests in the principal are in law the con-
   tracts of the consignor at the selling point, and if the
   transaction is not a single instance but one of a series
   and both parties contemplated a permanent arrange-
   ment to dispose of a large amount of goods, the arrange-
   ment constituted doing business within the State in
   which the goods were sold.

Error to Lenawee; O'Mealey, J.   Submitted April
6, 1915.   (Docket No. 7.)   Decided June 7, 1915.

Assumpsit by the E. A. Lange Medical Company
against E. J. Brace and others upon a guaranty or
indemnity contract.   Judgment for defendants upon
a verdict directed by the court.   Affirmed.

[1]As to transactions pursuant to agreement with local dealer
to sell product of foreign corporation within State, as doing
business therein, see note in 44 L. R. A. (N. S.) 1094; also
as to whether establishing agency to handle corporation's
product within the State is doing business therein, see note in
18 L. R. A. (N. S.) 142.

*Charles L. Robertson* and *James H. Cornelius,* for appellant.

*Baldwin, Alexander & Russell,* for appellees Froelich and Pickles.

*Burton L. Hart,* for appellee Brace.

This is an action arising out of a contract made October 12, 1909, between the E. A. Lange Medical Company, a Wisconsin corporation engaged in the manufacture and wholesale of spices, household remedies, and proprietary articles, and E. J. Brace, a resident of Michigan, providing as follows:

## "Agent's Contract.

"This contract, made this 12th day of October, A. D. 1909, by and between the E. A. Lange Medical Company of De Pere, Wis., party of the first part, and E. J. Brace, of Weston, State of Michigan, party of the second part, witnesseth:

"In consideration of the agreement of party of the first part, hereinafter provided, party of the second part makes the following agreements:

"1st. To enter the employ of said party of the first part as agent with authority to sell and take orders subject to the approval of and on such terms and conditions as instructed by said party of the first part, and in such territory as may be agreed upon and assigned him by said party of the first part, from time to time.

"2nd. To begin work promptly on receipt of stock and give his best skill and business ability to the prosecution of the business hereby undertaken, devote his entire time and attention to the business of the party of the first part, and make weekly reports of all goods sold, and he further agrees to remit to the company, at the end of each week, the invoice price of all goods sold during the week, for the first year. After one year from date of contract he agrees to remit to the company each week, one-half of his cash receipts until his account is settled in full, after which he receives a discount of 5 per cent. from the invoice price for all goods paid for within thirty days

from date of sale. All remittances to be made by P. O. order, express order, or Chicago exchange.

"3rd. That goods and any other property shipped or delivered to him by said party of the first part will be held in trust by him, and shall at all times be subject to the order of said party of the first part free from any lien thereon in favor of said party of the second part, and at the termination of this agreement or at any other time all goods or samples to be returned for exchange or otherwise are to be sent freight or express prepaid, and shall be in good condition, ordinary wear and tear excepted.

"4th. That if at any time said party of the first part shall pay said party of the second part more than is due him under the terms of this agreement, the amount of such overpayment shall be refunded to the said party of the first part on demand.

"5th. To furnish a suitable outfit, consisting of horse and wagon, same to be approved by party of the first part.

"In consideration of the above agreements and their fulfillment by said party of the second part, the E. A. Lange Medical Company, party of the first part, agrees to supply party of the second part with all remedies on the following terms:

"Goods at the prices named in the confidential price list furnished agents by the party of the first part. The party of the first part also agrees to deliver all goods to agent f. o. b. at their nearest railroad station; the party of the first part to supply party of the second part with all the goods they require and send them goods as they need them to the extent of 25 per cent. more than their bond. The party of the first part also agrees to exchange all broken or soiled packages. All mail orders received by the party of the first part from the territory of the party of the second part are to be placed to the credit of the party of the second part, who is to receive credit for same when said order is paid for to the extent of the net profit on same order after expenses of delivery and agents' cost of goods is deducted.

"This agreement may be terminated by either party hereto by giving notice to the other party, and may

be changed only by supplementary agreement signed by both parties and attached hereto.

"Signed in duplicate this day and date first above written.

"The E. A. LANGE MEDICAL CO.,
                    "By E. A. LANGE.
                        "E. J. BRACE, Salesman."

Attached to the above contract was a written guaranty, which reads as follows:

"Guaranty.

"We, the undersigned, guarantee that the salesman signing the above contract will return to the E. A. Lange Medical Company, as provided therein, within a reasonable time after demand, all samples and other property placed in his charge by them, and we jointly and severally agree to pay to the E. A. Lange Medical Company the invoice value of any samples or other property not so returned, provided that the amount of our liability shall not exceed the sum of five hundred dollars.

"Date Oct. 12, 1909.
            "JOSEPH FROELICH, Sand Creek, Mich.
                (Signature of Surety)
            "ED. PICKLES,
                (Signature of Surety)"

From time to time goods were shipped and consigned to Brace from Wisconsin, as ordered by him, were invoiced to him, and charged to him on the company's books. He was required to keep an account of the business in a book furnished by the company, and made weekly reports to the company showing what goods he placed on trial and the amount of his cash receipts. But he sold goods to whom he pleased and on such terms as he saw fit. Defendant Brace described his method of selling as follows on cross-examination:

"The method I followed in selling goods was to first get them from the company, and those that I did not carry with me in the wagon I stored in the hotel in Prattville. I did not pay any rent for the storage;

they allowed me to keep the goods there because I boarded there. When I had my wagon loaded with remedies, I stopped at every house, showed them the goods, and sold whatever they needed. I would tell them I was representing the E. A. Lange Medical Company with flavoring extracts, spices, and medicines, and show them to them, each article by itself as a rule, unless they knew what they wanted. If there was anything I had that they wanted, I let them have it, and told them the company puts this out on trial. The company puts this out on trial; you can use it down to the trial mark on the bottle, and if it was not satisfactory you could return that and the company would stand for it. The goods were to be returned to me and through me to the company. I would make an entry on my book at the retail price. I did not put the price on the book at wholesale, because lots of people would be liable to pick up that book, and it was supposed to be a confidential price, and I had no right to put anything except the retail price there. When I returned goods to the E. A. Lange Medical Company, they gave me credit for just what they charged me.

"When I ordered more goods from the Lange Medical Company, I did not say anything about paying for them. I paid for them only as I collected money for them. When I would collect money on the Lange Medical Company account I would send their per cent. to them, about once a week, when I worked, and the money would represent their proportion of all the cash collections of that week. During the time I had this money, I generally carried it in my pocket, * * * and kept all my money together until the end of the week. Then I would figure up how much belonged to the Lange Medical Company and how much to me, and send them their share. When I had gotten enough goods that had been taken up or were to be returned to the Lange Medical Company, I would pack them up and send them back. They would give me credit for them or return goods of equal value. I never sold any goods on credit. I always put them out on trial and sold them for cash, and when I went around again where they had the money they would pay for them: and, if they did not have the money, they would ask me to carry them over until the next

time and I would carry them over. Those that had an opportunity for trial and did not pay for their goods, I had to carry over; if they accepted the goods, I carried them over as an old account. I understood it was the Lange Company's account, but it was carried over because they did not have the money to pay for them; it was credit extended to the customer on the Lange Company's behalf by me. I would be obliged to collect the money before I had my money or they would have theirs.

"When I ran short of goods or sent in an order to the company, the goods would come after a spell, and I would take them out of the freight office and put them in my wagon or in the storeroom.

"The commission I made on the goods was the difference between the retail price and the confidential price list. Instructions were to follow these prices explicitly and not sell the goods for less than the retail price given on the price list."

When the company discontinued shipping goods to Brace in November, 1910, the latter failed to pay for some goods not returned to the company, and the latter made demand on the sureties for the maximum amount of their guaranty. They refused to pay, and this action resulted.

Defendants pleaded the failure of the plaintiff to comply with Act No. 310, Pub. Acts 1907, which makes it unlawful for any foreign corporation to carry on its business in this State until it shall have procured from the secretary of State a certificate of authority for that purpose, and prescribes a penalty for failure to comply with the requirements of the act. Section 6 provides:

"No foreign corporation, subject to the provisions of this act, shall be capable of making a valid contract in this State until it shall have fully complied with the requirements of this act, and at the time holds an unrevoked certificate to that effect from the secretary of State."

Section 8 provides in part:

"Nor shall this act be construed to prohibit any sale of goods or merchandise which would be protected by the rights of interstate commerce."

At the close of the proofs, the trial court directed a verdict for the defendants on the ground that the contract was invalid under said Act No. 310. Plaintiff brings the case into this court by writ of error to review the ruling of the trial court, and contends that in its dealings with Brace under the contract it was engaged in interstate commerce, and that it was not carrying on business within the State.

Kuhn, J. (*after stating the facts*). The question of whether or not the contract here involved relates to interstate commerce is not without difficulty. It being a Federal question, in its consideration we must necessarily be governed by the decisions of the Federal courts. Counsel for appellant rely upon the case of *Butler Bros. Shoe Co.* v. *Rubber Co.*, 156 Fed. 1, 84 C. C. A. 167, in which case Judge Sanborn, in an exhaustive opinion, has gone over this subject, and, with reference to the contract there in question, stated the following:

"Let us now turn to the contracts, observe what the rubber company agreed to do and what it actually did under them, and determine, if possible, whether or not in making or in performing these agreements it was guilty of doing any business within the meaning of the constitution and statutes of Colorado. It agreed to ship the goods from its warehouse, or its mill, upon the orders of the appellee, to that company in Denver; and it did so. It contracted to do, and it did, nothing more. It never had any office or place of business in Colorado. It never received, stored, handled, or sold any goods, or collected any money for the sales of any goods, in that State under this contract. It never incurred, assumed, or paid any expenses of doing all these things, or of conducting any of the business. The shoe company had and maintained a place of business in Colorado, it rented or

owned the place in which the business in Colorado was done, and it agreed to bear all the expenses and losses of receiving, storing, and selling the goods; and it did so. The purchasers of the goods were purchasers from it, solicited and secured by it. They were its customers, and liable to it for the purchase price of the goods. The goods were billed to them in the name of the shoe company as consignee. The profits of the business and the work of the business, the labor of receiving, storing, and selling the goods, were the shoe company's. The profits constituted its factorage, its compensation, for carrying on the business. There is no question here between the State and the shoe company, or between the shoe company and the purchasers of the goods, or between the rubber company and the purchasers of the goods. The question here is between the consignor and the factor, and it is whether the consignor, which did not agree to do, and did not in fact do, the business of receiving, storing, and selling these goods, or the factor who did contract to do, and did actually do, the business of receiving, storing, and selling these goods, in Colorado, and who received the factorage therefor, was doing that business. In a simple transaction, the true answer seems clear. A farmer sends to a commission merchant in a city a dozen barrels of apples for him to sell. The factor puts them in his store, sells them, receives the proceeds, and remits them, less his factorage. The farmer from time to time sends 1,000 barrels during the season, and they are sold and the proceeds are remitted in the same way. The farmer is not carrying on the business of selling apples in the city, but the factor is. The transaction in hand is larger, but in every element which conditions its legal character and effect it is not different. The transaction between the parties to this suit was interstate commerce. The rubber company did not agree to do, and did not actually do, any of the business of receiving, storing, and selling the goods in Colorado. The shoe company did agree to do, and did do, that business. These facts have driven our minds with compelling force to the conclusion that, within the true intent and meaning of the constitution and statutes of Colorado, the rubber company was not doing business in that State, and

the contracts between these litigants are valid and enforceable."

In the case of *Re Monongahela Distillery Co.* (D. C.), 186 Fed. 220, Judge Denison said the following:

"The parties had been dealing for years on the ordinary basis of selling and buying, and such basis was changed only because the buyer's financial standing became so poor that regular sales on credit were not safe. The seller, the Schufeldt Company, adopted this form only for the purpose of avoiding the risk of loss in making a sale on credit, and took no precautions not adapted to that end. Obviously, when a consignor without the State ships goods to a factor within the State, retaining the title thereto, and contemplating sales by the factor to its customers within the State, the entire transaction partakes of the character of both interstate commerce and doing business by the consignor within the State. Under the rule stated in *Higgins* v. *McCrea*, 116 U. S. 671, 6 Sup. Ct. 557, to the effect that the contracts of sale made by a factor in his own name are in law the contracts of the consignor, it would seem that sales so made were sales by the consignor at the selling point, and that when, as in this case, the transaction was not a single instance, but both parties contemplated a permanent arrangement, disposing of a large amount of goods, it constituted doing business at that point; but such conclusion is only argumentative, and the contrary result is reached by the circuit court of appeals of the eighth circuit, in a very elaborate opinion in *Butler Bros. Shoe Co.* v. *Rubber Co.*, 156 Fed. 1, 84 C. C. A. 167. This decision was made in 1907. A writ of certiorari was denied by the Supreme Court. 212 U. S. 577, 29 Sup. Ct. 686. It has been cited and followed by the circuit court of appeals in the seventh circuit (*Atlas Engine Works* v. *Parkinson*, 161 Fed. 229), and I cannot find that it has been in any way questioned. I therefore accept the rule there stated, and think that there are no circumstances in the present case distinguishing it from the *Butler Bros. Case.*

"The question of what is interstate commerce is a Federal question, and the decision of the Supreme

Court of Michigan in *Neyens* v. *Worthington*, 150 Mich. 580 (114 N. W. 404, 18 L. R. A. [N. S.] 142), would not control, even if parallel; but the circumstances, 1, 2, 3, and 4, pointed out on page 586 of 150 Mich., on page 404 of 114 N. W., on page 142 of 18 L. R. A. (N. S.), fully distinguished the two cases on their facts."

It will be noticed that in the latter opinion the Michigan case of *Neyens* v. *Worthington*, 150 Mich. 580 (114 N. W. 404, 18 L. R. A. [N. S.] 142), is distinguished from the *Butler Bros. Shoe Co. Case, supra;* and the conclusion might well be arrived at that, if that case can be distinguished from the rule established in the *Butler Bros. Shoe Co. Case,* the instant case might be also distinguished; because here we have a contract which clearly provides for the shipment into this State of the property of the medical company, to be stored and kept by the agent, who under the terms of the contract was to give his entire time to the business of the medical company, which business, it must be said, was to sell and dispose of the property so received in this State. Brace, the agent, signs the contract as salesman, and in the guaranty he is referred to as the salesman of the plaintiff company. From the terms of the contract, it seems very clear indeed that what was intended thereby was to make Brace the salesman of the plaintiff company to carry on and develop its business in the territory assigned to him. It follows that, by a succession of such contracts and a division of the territory, the medical company could—and probably would—cover the State with salesmen, actively engaged in doing its business. To our minds, it would be rather anomalous to say that this would not be carrying on its business within the State.

In our opinion, the circumstances here are as convincing as those pointed out by Judge Denison in the *Monongahela Distillery Co. Case, supra,* which

brought the case of *Neyens* v. *Worthington, supra,* from under the rule announced in the *Butler Bros. Shoe Co. Case.* On the facts, we believe the instant case is readily distinguishable from the Federal cases above referred to, as in both of those cases the factors maintained their own stores and warehouses and had their own customers, did not devote their entire time to the business of the foreign corporation, and were not designated their salesmen in the contracts.

We are of the opinion that it must be said that the plaintiff was carrying on its business in the State of Michigan within the meaning of said Act No. 310, Pub. Acts 1907. The trial judge arrived at a proper conclusion in so holding, and the judgment of the lower court is therefore affirmed.

BROOKE, C. J., and MCALVAY, STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred. BIRD, J., did not sit.