REX BEACH PICTURES CO. v. HARRY I. GARSON
PRODUCTIONS.

1. CORPORATIONS — FOREIGN CORPORATIONS — DOING BUSINESS IN STATE.

Where plaintiff, a foreign corporation, without having secured a certificate of authority to do business in this State, under 2 Comp. Laws 1915, § 9063, made a contract with an agent to secure contracts to show its motion pictures in the theaters of various cities in this State, said contracts being subject to plaintiff's approval, it was carrying on business in this State without authority so to do.

2. SAME—VOID CONTRACTS—RIGHT TO MAINTAIN ACTION.

A penalty being provided by section 9067 for any corporation subject to the provisions of the act which shall neglect to comply therewith, said contract was void, and against the settled policy of the State, and no action thereon could be maintained, under 3 Comp. Laws 1915, § 12370.

3. REPLEVIN—TORT ACTION.

Replevin is an action of tort.

The question as to when a foreign corporation which has entered into a contract for the local handling of its product may be considered as doing business within the State within the meaning of a statute prescribing the conditions upon which foreign corporations may transact business therein, is discussed in a note in L. R. A. 1916F, 334.

On establishment of agency to handle a corporation's product within the State as doing business therein, see note in 18 L. R. A. (N. S.) 142.

4. Corporations—Foreign Corporations—Right to Maintain Replevin.

An action of replevin, brought by plaintiff against its Michigan agent to recover possession of prints of a certain motion picture belonging to it, *held*, not repugnant to the provisions of 3 Comp. Laws 1915, § 12370, since plaintiff's right to the possession of the property in question does not depend upon the void contract.

5. Same—Evidence—Sufficiency.

Evidence that plaintiff was the owner, and was entitled to the possession of the property, and that a proper demand therefor had been made, *held*, sufficient to send the case to the jury.

Error to Wayne; Murphy (Alfred J.), J.   Submitted January 22, 1920.   (Docket No. 11.)   Decided April 10, 1920.

Replevin by the Rex Beach Pictures Company against Harry I. Garson Productions and others for the possession of certain pictures.   Judgment for defendants on a directed verdict.   Plaintiff brings error. Reversed.

*Angell & Turner*, for appellant.

*Robert M. Brownson* (*Frederick S. Baker*, of counsel), for appellees.

Stone, J.   This is an action of replevin to recover possession of prints of a motion picture, known as "The Barrier."   The circuit court directed a verdict and judgment for the defendant, on the ground that the plaintiff was a foreign corporation which had not been admitted to do business in Michigan.   The plaintiff is a Maine corporation.   There is no question that it had not applied for admission to Michigan.   The writ ran against three defendants, upon one of whom service was not had.   The trial court dismissed the case as to the individual defendant Harry I. Garson

(of which no complaint is made), and directed a verdict and judgment in favor of the defendant Harry I. Garson Productions, a Michigan corporation, which had possession of the prints at the time the suit was brought, for the reasons stated.

The declaration is in the usual form in replevin. The plea was the general issue, with notice that plaintiff is a foreign corporation, not admitted to do business in Michigan. It appeared at the trial that the plaintiff is engaged in the business of producing motion pictures, and is the owner of a motion picture photoplay entitled "The Barrier." On April 24, 1917, the plaintiff entered into a contract with the Lewis J. Selznick Enterprises, Inc., a New York corporation, for the distribution of "The Barrier." That contract appears as exhibit 1 in the record and is as follows:

"Agreement made and entered into the 24th day of April, 1917, by and between the Rex Beach Pictures Company, Inc., a corporation formed and existing under the laws of the State of Maine, and duly authorized to conduct its business within the State of New York, party of the first part (hereinafter called the 'Beach Company'), and Lewis J. Selznick Enterprises, Inc., a corporation formed and existing under the laws of the State of New York, party of the second part (hereinafter referred to as the 'Selznick Company') :

"Witnesseth:

"Whereas, the Beach Company is the owner of the photoplay entitled, 'The Barrier,' by assignment from Benjamin B. Hampton heretofore duly executed and delivered; and

"Whereas, the Beach Company desires the use and facilities of the exchanges owned, operated by or affiliated with the Selznick Company, in the exploitation and rental of such photoplay, and is willing to pay therefor upon the basis hereinafter provided:

"Now, therefore, in consideration of the premises and one dollar ($1.00) paid by the Beach Company to the Selznick Company, receipt whereof is hereby acknowledged, the Beach Company and the Selznick Company agree as follows:

"*First:* The Beach Company shall deliver to the branch exchanges of Selznick Company the necessary positive prints of the said photoplay, paying transportation charges on such positive prints from the manufacturer to the exchanges, and paying transportation charges on film shipped from one branch to another on Beach Company's order. Beach Company shall pay similar charges whenever film is ordered returned to its office from exchanges; it being understood that other transportation charges, if any, between exchanges and exhibitors shall be at the expense of Selznick Company.

"*Second:* Selznick Company shall book the said photoplay through its regular channels and affiliated exchanges, but as agent of the owner, on special forms of contract drawn so that all contracts shall appear as made by Lewis J. Selznick Enterprises, Inc., as agent of the Rex Beach Pictures Company. Such special forms of contract shall be furnished to Selznick Company by Beach Company, and shall be executed in quadruplicate one copy to be left with the exhibitor, one with the branch exchange and two copies to be forwarded to the Selznick Company at its New York office, one of which shall be transmitted forthwith to Beach Company. All booking made by Selznick Company or its affiliated exchanges shall be approved in writing by Beach Company, or its duly authorized representative, and shall not be effective until such approval has been properly indorsed upon at least one copy of such contract.

"*Third:* Settlements shall be made to the parties in interest in accordance with contract of October 10, 1916, and April 24, 1917, referring thereto on Thursday of each week, and shall include all collections on rentals of film and advance payments on bookings, less the commission due Selznick Company for its services as hereinafter stated, up to and including the Saturday prior to such settlement; it being understood that collections are to be accounted for as received at the main office; it being understood that all moneys collected shall be transmitted as the same are received, so far as possible, especially in the case of large collections, less commissions due Selznick Company for its services as hereinafter stated, but that a

complete settlement as hereinabove set forth shall be made on Thursday of each week. It is understood that the funds in the hands of Selznick Company shall be regarded as trust funds, which, however, may be commingled with its own funds and that no title thereto shall vest in Selznick Company as the same shall pass through its hands, and that Selznick Company does not guarantee collections and shall not be responsible for unpaid bills for rentals of film, nor shall it be responsible for theft of film (except where such theft is committed, aided or abetted by Selznick Company employees), duplication, loss in transit, or by fire, or for any other losses beyond its control.

"*Fourth:* Selznick Company shall keep accurate records of contracts and accounts, and Beach Company shall have the right at all reasonable times to examine the books and records of Selznick Company, showing rental contracts and all other items in connection with the subject-matter of this contract.

"*Fifth:* Selznick Company shall keep all positive prints in good repair; it being understood, however, that replacements of missing and worn parts shall be made by (and) at the expense of Beach Company, to be charged at current rates for such replacements.

"*Sixth:* Selznick Company shall afford Beach Company full benefit of the facilities which it has in its press agents and publicity work.

"*Seventh:* In consideration of the services rendered and facilities afforded by Selznick Company, it shall be entitled to receive an amount equal to thirty-five per cent. (35%) of the gross rentals collected by it or its affiliated exchanges from exhibitors. It is understood and agreed that this compensation shall apply also to gross rentals heretofore received by the previous distributor or distributors of this photoplay except that on bookings actually executed by previous distributors and paid for, Selznick Company shall allow credits of twenty per cent. (20%), and upon bookings received and approved by Beach Company or B. B. Hampton, up to the date of transfer to the superseding distributor, but which have not been executed, Selznick Company shall allow credits of ten per cent. (10%) as collections are made. It is understood that on previous theatrical exhibitions, where a profit has

been shown, Selznick Company's commission shall be computed upon the net profit.

"*Eighth:* Selznick Company acquires no title of any nature whatsoever to the films consigned by Beach Company, and Beach Company shall be entitled to immediate possession of all films consigned and distributed through the various exchanges at any time, subject to any right of distribution herein conferred.

"*Ninth:* In the event that an exhibitor shall not play said picture upon the dates contracted for, for any reason beyond his control and satisfactory to Beach Company and Selznick Company, any prepayment may be refunded, in part or in full.

"*Tenth:* The Beach Company agrees to pay all censorship fees and other taxes which may be imposed by municipalities, State or national governments, upon positive prints or negative of 'The Barrier'; provided, however, that no such tax shall be paid until such payment is directly authorized by Beach Company.

"*Eleventh:* It is understood and agreed that Selznick Company shall buy and sell all advertising material and distribute the same for its own account, subject to the approval of the proper officer of Beach Company, concerning the prices charged for such advertising material; the purpose of this clause being to prevent overcharging for advertising material which would prevent a proper circulation of such matter.

"*Twelfth:* This contract shall operate for a period of three (3) years, provided rentals amounting to two hundred thousand dollars ($200,000) shall have been secured and collected during the first year of such contract, and three hundred thousand dollars ($300,000) in the aggregate prior to the end of the second year.

"It is further understood and agreed that in case of the death, incapacity or disability of Lewis J. Selznick personally to attend to, manage and generally supervise the business and operations of Lewis J. Selznick Enterprises, Inc., and its affiliated agencies, that the Beach Company may, upon thirty (30) days' written notice and upon condition that it assume and discharge the guarantee of said Selznick under said contract of April 24th, 1917, hereinabove referred to,

cancel this contract, and the same shall thereupon, at the expiration of such time, be at an end, and neither party shall have any further rights as against the other except for an accounting of business already undertaken and completed.

"In witness whereof, Beach Company has caused its corporate name to be hereunto subscribed by its president, thereunto duly authorized, and its corporate seal to be affixed, and Selznick Company has caused its corporate name to be hereunto subscribed by its president, thereunto duly authorized, and its corporate seal to be affixed, the day and year first above written.

"Rex Beach Pictures Company, Inc.,
"By Benjamin B. Hampton, President.
"Lewis J. Selznick Enterprises, Inc.,
"By Lewis J. Selznick, President."

In acting as plaintiff's agent under the above contract, the Selznick Company, through its president, Lewis J. Selznick, negotiated with Harry I. Garson Productions, a Michigan corporation, through Harry I. Garson, for the distribution of "The Barrier" in the State of Michigan. The uncontradicted testimony as to the employment of the defendant Harry I. Garson Productions by the plaintiff, through Mr. Hampton, its president, and the Selznick Company, plaintiff's agent, is too lengthy to be here inserted, but has been carefully read. The contract form with exhibitors was shown Mr. Garson. It contained the method of doing business by plaintiff. By this contract form agreements were to be entered into between the Rex Beach Pictures Company, Inc., therein designated as the "owner" of the motion picture photoplay entitled "The Barrier," and local exhibitors within the State of Michigan, whereby such owner would rent such photoplay direct to such exhibitors for exhibition in local theaters for a designated number of days at an agreed rental price. The contract form provided that the agreements with local exhibitors should be executed and approved in the following manner:

"Rex Beach Pictures Co., Inc.,
        By........................
        Exhibitor..................
        By........................
"Approved by N. Y. Office of
Rex Beach Pictures Co., Inc.,
    By...................."

Numerous contracts in pursuance of the above arrangement were entered into for the exhibition of "The Barrier" in Michigan. Prints of such motion picture for use by local exhibitors were forwarded from New York through the Selznick Company and the General Film Company early in May, 1917. Mr. Selznick testified:

"The contract I entered into with Garson Productions as distributor of 'The Barrier' was being operated under, on May 3d. The Garson Productions got one of these prints of 'The Barrier' from the General Film Company, under my instructions. The other print was shipped from our office in New York. The advertising matter they got either from the General Film Company or through us."

It is said disputes between the Selznick Company and Garson Productions about other matters arose which resulted in litigation, and on June 14, 1917, the plaintiff, by letter, demanded possession of "The Barrier." That letter was addressed to Harry I. Garson Productions, Inc., and was in substance as follows:

"We understand that you have in your possession certain positive prints and advertising matter of the motion picture entitled 'The Barrier,' and that you have been exhibiting said motion picture. Please deliver all such positive prints and advertising matter, to Mr. D. Leo Dennison, care of Pontchartrain Hotel, Detroit, Michigan, and account to us for the receipts from such exhibition.

            "Yours very truly,
        "REX BEACH PICTURES COMPANY, INC.,
            "BENJ. B. HAMPTON, President."

Upon failure to comply with this demand this suit was brought. Plaintiff bases its right to maintain this action upon two propositions:

(1) That at no time did it ever transact its business within this State.

(2) That if it was so transacting, in Michigan, its business it has the right to bring an action of replevin for the recovery of what was confessedly its own property, withheld from it without right.

1. A careful reading of the record leads us to the conclusion that the evidence sustained the following claims of the defendant:

(a) Plaintiff, the owner of a certain motion picture, desiring to use the facilities of the Selznick Company, a distributing agency, in marketing this picture among theater owners, made a contract with such distributor for the exploitation and distribution of such motion picture, and "in consideration of such services rendered and facilities afforded," agreed to pay the Selznick Company an amount equal to 35 per cent. of the gross rentals collected by it.

(b) The Selznick Company, as agent of plaintiff, agreed to book such photoplay through its regular channels and affiliated exchanges on special contract forms, to be supplied by plaintiff. All such bookings were to be approved in writing by plaintiff and were not to be effective until so approved.

(c) All funds and revenues derived from rentals to exhibitors were to be regarded as trust funds in the hands of Selznick Company, and no title thereto was to vest in the Selznick Company, as the same should pass through its hands.

(d) The Selznick Company acquired no title of any nature whatsoever to the films consigned to it by plaintiff.

(e) The Selznick Company, as agent of plaintiff, and with its express consent and approval, designated and employed the defendant, the Garson Productions,

as the Michigan agent of the plaintiff, with express instructions that all Michigan bookings were subject to plaintiff's supervision and approval and were to be made on contract forms, where the local exhibitor was to be brought into direct contract relations with the plaintiff as owner.

(*f*) No attempt was made nor was it ever contemplated that the Garson Productions should purchase or rent prints or films of plaintiff's motion picture. The Garson Productions was to be paid for distributing such picture 20 per cent. of the revenue derived from local exhibitions in Michigan.

(*g*) The Garson Productions was employed by plaintiff through its authorized agent (Selznick) to exploit and distribute "The Barrier" in the State of Michigan for a term of one year, and to solicit and procure contracts with local theaters in the name of the plaintiff, a foreign corporation, as owner, at prices and terms to be approved by such foreign corporation in each and every instance.

(*h*) The sole purpose of this agreement between these parties was to create an agency or means whereby the plaintiff, a foreign corporation, in the conduct of its ordinary business, was to derive a continued revenue from the exhibition of its motion picture (of which it always and at all times remained the absolute owner) to audiences assembled in different Michigan theaters, and from revenues so derived to receive as its share of the income produced by such acts performed in Michigan, 80 per cent. of the gross receipts, income and revenue.

(*i*) The contract employing the Garson Productions to distribute plaintiff's motion picture in Michigan, made with the plaintiff through its authorized agent, the Selznick Company, as testified to by Mr. Selznick, was being operated under on May 3, 1917, and two prints of "The Barrier" and advertising mat-

ter in connection therewith were furnished to the Garson Productions by the plaintiff or its agents, and in pursuance of the agreement between the parties at least 29 contracts were procured for the plaintiff on contract forms, of which at least four or five were entered into, prior to plaintiff's letter of June 14, 1917, demanding the return of such property, and an accounting for the receipts from such exhibitions.

The plaintiff has brought the case here for review. Its first assignment of error is:

(1) That the court erred in charging the jury that plaintiff was a foreign corporation carrying on business in the State of Michigan, without having authority so to do.

(2) That the court erred in directing a verdict in favor of the defendant Harry I. Garson Productions, upon the grounds stated in its charge.

(3) That the court erred in directing a verdict in favor of the defendant Harry I. Garson Productions, upon the ground that plaintiff was a foreign corporation carrying on business in the State of Michigan without having received authority so to do.

1. In our opinion the court did not err in charging the jury that plaintiff was a foreign corporation carrying on business in the State of Michigan, without having authority so to do.

In *Neyens* v. *Worthington,* 150 Mich. 580, 587 (18 L. R. A. [N. S.] 142), the following language was used by this court, which we think applicable to the instant case:

"This agreement by its terms was an invasion of this State by a foreign corporation, not simply to make sales of products manufactured and delivered in a foreign State, nor was it a single act of business without intent or purpose to do any other business; but it was for the express purpose of extending and establishing its business permanently within the State."

The following authorities are also applicable:  *E.*

*A. Lange Medical Co.* v. *Brace,* 186 Mich. 453; *Nernst Lamp Co.* v. *Conrad,* 165 Mich. 604, 609; *Imperial Curtain Co.* v. *Jacob,* 163 Mich. 72, 77.

In our opinion, under our authorities, it appears very plainly that the plaintiff was carrying on business in this State without having authority so to do. In this connection attention is called to sections 9063, 9067 and 9068, 2 Comp. Laws 1915. In section 9067 it will be noted that every corporation subject to the provisions of the act which shall neglect to comply with its requirements shall be subject to a penalty as therein prescribed.

2. While, as we have said, the court did not err in holding that plaintiff was a foreign corporation carrying on business in this State without having authority so to do, the question arises, whether for that reason the court was justified in directing a verdict for the defendant? It should be borne in mind that this is an action in tort for the recovery of the possession of property confessedly belonging to the plaintiff, after proper demand had been made therefor. The authorities are uniform in holding that replevin is a personal action *ex delicto,* brought to recover goods unlawfully taken or detained. Unless the statute says so, the non-compliance by a foreign corporation with the terms and conditions upon which the domestic law allows it to enter the State and do business will not preclude it, or anyone claiming through it, from maintaining an action which is purely *ex delicto.* We have no doubt that under the provisions of our statute, above referred to, it was unlawful for the plaintiff to carry on its business in this State; and it was incapable of making a valid contract for such purpose until it had complied with the requirements of the statute. A penalty is provided for the violation of these provisions, and, in our opinion, the contract was void, and against the settled policy of this State.

In *Cashin* v. *Pliter*, 168 Mich. 386 (Ann. Cas. 1913C, 697), this court quoted, with approval from a former opinion, the following language:

"It is a well settled principle of law that all contracts which are founded on an act prohibited by a statute under a penalty are void, although not expressly declared to be so."

Conceding that the contract was void and the doing of business unlawful, must the property of the plaintiff be forfeited because of the provisions of the statute? In this connection defendant's counsel call attention to section 12370, 3 Comp. Laws 1915, which reads as follows:

"But when, by the laws of this State, any act is forbidden to be done by any corporation, or by any association of individuals, without express authority by law, and such act shall have been done by a foreign corporation, it shall not be authorized to maintain any action founded upon such act, or upon any liability or obligation, express or implied, arising out of, or made or entered into in consideration of such act."

We have examined, and invite attention to, our decisions found in the note appended to this section. They are to the effect that no action can be maintained to recover from an agent moneys collected by him under such contracts. Many of them are insurance cases in which it was held that a foreign company could not sue in this State to collect assessments upon policies so made. Such contracts are prohibited, and are at variance with the settled policy of the State.

The following language, found in 2 Elliott on Contracts, § 665, is pertinent here:

"Again it has been said:

"'It is no doubt the general rule of law, that no right of action can spring out of an illegal contract. And the rule that an illegal contract cannot be enforced, applies as well to contracts *malum prohibitum*, as to contracts *malum in se*. But it does not necessarily follow that all the consequences attend-

ing a contract, which is contrary to public morals, or founded on an immoral consideration, attend and affect a contract *malum prohibitum* merely. The law in the former case will not undertake to relieve parties from the position in which they have placed themselves, or to adjust the equities between them. But in the latter case, while the law will not enforce the prohibited contract, it will take notice of the circumstances, and if justice and equity require a restoration of money or property, received by either party thereunder, it will give, and in many cases has given relief.'"

—citing, among other cases, *Pratt* v. *Short,* 79 N. Y. 437; *In re T. H. Bunch Co.,* 180 Fed. 519.

In 13 Am. & Eng. Enc. Law (2d Ed.), at p. 892, appears the following language:

"Even where the corporation is doing business within the State without complying with the statutory provision it is not thereby prevented from suing in tort";

—and the following cases are cited: *St. Louis, etc., R. Co.* v. *Fire Ass'n,* 60 Ark. 325 (30 S. W. 350, 28 L. R. A. 83); *Utley* v. *Mining Co.,* 4 Colo. 369 (an action of trespass); *American Typefounders Co.* v. *Conner,* 26 N. Y. Supp. 742 (action of replevin); *Probst* v. *Trustees,* 3 N. Mex. 373 (5 Pac. 702); *Smith* v. *Little,* 67 Ind. 549 (action of replevin); *Powder River Cattle Co.* v. *Custer County Com'rs,* 9 Mont. 145 (22 Pac. 383). See, also, *Delaware, etc., Telephone Co.* v. *Pensauken Township,* 116 Fed. 910; *Duroth Manfg. Co.* v. *Cauffiel,* 243 Pa. St. 24 (89 Atl. 798); *United Shoe Machinery Co.* v. *Ramlose,* 231 Mo. 508 (132 S. W. 1133). We quote from the head note of the last-cited case:

"Notwithstanding the lease in pursuance to which the machines passed into the defendant's possession was void, because the lessor, being a foreign corporation, had not complied with the laws of this State authorizing it to do business here, the court will not leave the property where the parties have themselves placed it, but will permit the lessor to replevy the machines or to maintain trover for their value; and thereby

209—Mich.—45.

the court does not indirectly avoid the statute and give practical validity to the lease or contract. Relief is never denied on such ground unless the maintenance of the suit would necessarily result in giving force and effect to the void contract, or unless the contract itself is tainted with fraud or immorality.

"The statute does not deny to a foreign corporation the right to maintain a suit for the recovery of its property in this State, and if' it did it would be of doubtful validity; it simply denies to such company the right to do business in this State."

See, also, *Schlitz Brewing Co.* v. *Ester,* 86 Hun, 22 (33 N. Y. Supp. 143), affirmed 157 N. Y. 714 (53 N. E. 1126). Many other authorities to the same effect might be cited.

That replevin is an action of tort, see *Witty* v. *Campbell,* 44 N. Y. 410. It should be borne in mind that the contract in this State was simply void because prohibited by statute. It was a contract *malum prohibitum.* Under such circumstances, as was said by the court in the *Powder River Cattle Co. Case,* it does not mean that the corporation cannot protect its property, and does not allow others to confiscate the property of the corporation.

Is it the necessary and inevitable effect of the invalid or unlawful contract (invalid or unlawful because prohibited by the statute) to confiscate and forfeit the property of the plaintiff, and leave it in the hands of the defendant beyond the right of recovery? That does not seem to be just. While our courts will not enforce the prohibited contract, they will take notice of the circumstances, and if justice requires it, restore the plaintiff's property, received by the defendant under such void contract.

There was, concededly in this case, evidence that the property described in the writ of replevin belonged to the plaintiff and a proper demand therefor had been made, as was held by the trial court. Can it be said that it would be an act of justice that

the plaintiff must forfeit this property by reason of the void contract?  We think not.  The action of replevin, in our opinion, is not repugnant to the terms of section 12370, above quoted.  The plaintiff's case, under the circumstances, is made out when it shows that it is the owner of the property and entitled to its possession, and that a proper demand has been made therefor.  Plaintiff's right to the possession of the property in question does not depend upon the void contract, but is rather in spite of, or notwithstanding such contract and the doing of business thereunder.  The defendant is in no position to claim that it holds this property by authority of a void contract; the moment that void contract is shown, it then appears that the property is unlawfully detained by the defendant.  There was at least sufficient evidence that the plaintiff was the owner, and was entitled to the possession of this property, and that a proper demand therefor had been made, to have sent this case to the jury.

In our opinion the court erred in directing a verdict for the defendant, and the third assignment of error is well alleged.  The judgment of the court below is therefore reversed and a new trial granted, with costs to the plaintiff.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.