NERNST LAMP CO. *v.* CONRAD.

CORPORATIONS—FOREIGN CORPORATIONS—INTERSTATE COMMERCE—STATUTES—RIGHT TO TRANSACT BUSINESS—LICENSE.

Without having obtained a statutory license to transact business in Michigan, a foreign corporation was not entitled to recover for electric lamps and lighting supplies sold to defendant under a contract providing that the seller should correct defects of labor and material, furnish solicitors to aid in selling the goods, and supply the merchandise ordered by defendant, where plaintiff maintained a sales manager and a branch office in this State, and the purchaser agreed to furnish current for the lamps, do necessary wiring and maintain the lamps free of charge; and such contract did not constitute interstate commerce within the exception of Act No. 310, Pub. Acts 1907.

Case-made from Livingston; Miner, J. Submitted April 4, 1911. (Docket No. 10.) Decided May 8, 1911.

Assumpsit by the Nernst Lamp Company against Carl C. Conrad on open account. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on case-made. Affirmed.

*Shields & Shields,* for appellant.

*Louis E. Howlett,* for appellee.

The plaintiff is a foreign corporation, with a manufacturing plant in Pittsburg, Pa. It had never been admitted to do business in the State of Michigan prior to March 3, 1910, when it filed a certified copy of its articles of incorporation, its certificate of appointment of an agent in this State to accept service of process, and a sworn statement of two of its officers. On the 16th of March, 1908, it was in the hands of receivers, appointed, we assume, by the circuit court of the United States for the western district of Pennsylvania. It appears that the defendant was doing business in Brighton, in the State of Michigan, under the name of Brighton Electric Light & Power Company, and that he proposed to install in Brighton a system of electric lighting which should use as a fixture the Nernst lamp, a patented article, the manufacture and sale of which was controlled by the plaintiff. The receivers, in their own names, with words descriptive of their character, and the defendant made a contract in writing, dated March 16, 1908, by the terms of which the Nernst Lamp Company was to sell to the defendant Nernst lamps and renewal parts at certain prices, retaining title to all apparatus and property sold until all payments therefor had been made.

The preamble to this contract reads, in part, as follows:

"Whereas, the company [meaning the Nernst Lamp Company] is engaged in the manufacture of and sale of the Nernst lamp and its accessories, and has established a district sales office for the sale and maintenance of Nernst lamps, within the district in which said central station [the defendant] is operating; and whereas, in the furtherance of its business in said district, the company is desirous of introducing its products for use upon the circuits of the central station, and the central station is desirous of undertaking the introduction of the same upon its circuits at Brighton, Mich."

Some of the terms of the contract are here set out:

"The company agrees, at its own expense, to correct any defects of labor or material which may develop under normal conditions and proper use, provided the central station gives written notice of such defects within thirty (30) days after installation; but no goods are to be returned to the company to be repaired at the company's expense, or to be replaced with other stock, or to be credited to the central station's account, until the company shall have had a reasonable opportunity of inspecting the same and permission for such return has been issued either from the Pittsburg office or from the office of the district sales manager."

"The central station agrees: (*a*) To employ competent help to supervise the installation and maintenance of all Nernst lamps installed, and to install and maintain the same in accordance with the system set forth in the company's bulletin No. a 1 ( a copy of which is hereto attached, and made a part of this contract and marked 'Exhibit A'). ( *b* ) To maintain a voltage regulation within five (5) per cent. above or below normal on the circuit or circuits upon which the Nernst lamps are operated. ( *c* ) To not furnish Nernst lamps or material to other than parties connected with and using current upon the system owned and operated by the central station and whose lamps the central station maintains in accordance with this contract and marked 'Exhibit A.'"

In a supplementary memorandum of agreement the company agreed to furnish the central station free of charge, and at its own expense, the services of one or more solicitors for certain periods, to be determined by the said company, to co-operate with and assist the defendant in the introduction and sale of Nernst lamps on its circuits, and the defendant agreed to aid such solicitors in the introduction and sale of lamps, authorizing them to close contracts for current for use with Nernst lamps at rates provided for in the contract.

It was also agreed that:

"(5) The central station agrees to push the introduction of Nernst lamps on its circuits, selling such lamps to users of its current at list prices or lower or renting such lamps to its consumers by making a monthly charge

which shall not exceed 5% of the cost of the lamps to the central station.

" (6) The central station agrees to quote and sell current for use with Nernst lamps at its regular rates, less an extra discount of 10%, such extra discount to be quoted and given as a differential in consideration of consumers purchasing their own Nernst lamps.

" (7) The central station agrees to furnish 220 volt service upon any of the circuits of any of its consumers upon which it is desired to use Nernst lamps and to offer such 220 volt service to all prospective users of Nernst lamps; or, to furnish Nernst lamp converter coils free of charge to consumers purchasing Nernst lamps.

" (8) The central station agrees to furnish free of charge and at its own expense all necessary labor and material for wiring for Nernst lamps, provided (*a*) the consumer purchases such lamps, and (*b*) the consumer agrees to pay a minimum charge of _____ per glower unit per month.

" (9) The central station agrees to furnish free of charge and at its own expense all necessary material and labor for properly installing Nernst lamps, at existing outlets of consumers, and to offer such free labor and material to all prospective users of Nernst lamps.

" (10) The central station agrees to maintain free of charge and at its own expense all Nernst lamps operating on its circuits, and to offer such free maintenance to all prospective users of Nernst lamps, such maintenance to be in accordance with section II of contract of even date."

These contracts, in terms, were not binding upon the receivers until executed by the general sales manager. Both were so approved. It appears from the testimony introduced on the part of the plaintiff that the Nernst Lamp Company or the receivers thereof, before, at, and after, the time when these contracts were made, maintained an office in the city of Detroit, called a district sales office, managed by a district sales manager, the territory in the district being Michigan and certain counties in the State of Ohio; that the sales made in this territory went through the district office in Detroit, although occasionally the mail went direct to Pittsburg and was handled and taken care of there; that the managers had solicitors under them,

traveling from the Detroit office; that the manager acted sometimes as solicitor, but more often in the capacity of engineer, making plans for the introduction of lighting systems in factories and other buildings. The sales manager handled correspondence and reported to the main office in the city of Pittsburg the work done in his office.

A witness gave the following testimony:

"In some cases we sell lamps where we take care of them. The Nernst lamp will burn out and have to be renewed, similar to the arc lamp, where the carbons burn out. We have a boy or boys, who, in case we have a contract with a customer to take care of the lamps, handle it. I sometimes, from my office or elsewhere, sold lamps in my territory in Michigan. And as a part of the contract of sale in this State the company agrees to maintain them and take care of them. This is not in every case, however; just in some special cases. And the company was engaged in that kind of business in the State of Michigan in 1908 and 1909. * * * The contract made with defendant was similar to those made in the State of Michigan. Following the shipment of some lamps to Mr. Conrad, we sent a man to Brighton for the purpose of assisting in the installation of those lamps. His name was Ross C. Brown. We might have sent another man there, but I do not recall it. They were sent at the expense of the Nernst Lamp Company, and in pursuance with the terms of the contract made with defendant."

This suit is brought to recover the price and value of certain goods ordered from the plaintiff by the defendant, pursuant to the contract. The plaintiff declared on the contract, and also on the common counts in assumpsit, alleging an assignment of the demand by the receivers to the plaintiff company. It is agreed that, if plaintiff is entitled to recover, the judgment should be, or should have been, at the time of the trial in the court below, $324.82. Upon the motion of the defendant, the court directed a verdict for the defendant, upon the ground that the contract was affected by Act No. 310, Pub. Acts 1907, the provisions of which statute make it unlawful for any foreign corporation to carry on business in this State, until it shall have

procured from the secretary of State a certificate of authority for that purpose, and containing the further provisions (sections 6, 8) :

" No foreign corporation, subject to the provisions of this act, shall be capable of making a valid contract in this State until it shall have fully complied with the requirements of this act; and at the time holds an unrevoked certificate to that effect from the secretary of State. * * * Nor shall this act be construed to prohibit any sale of goods or merchandise which would be protected by the rights of interstate commerce."

No formal assignment of the demand in suit by the receivers to the plaintiff was produced.

OSTRANDER, C. J. (*after stating the facts*). It is clear that plaintiff corporation, by its receivers, was carrying on its business in this State at the time the contract in question was made.

Was the business so carried on interstate commerce? The question must be answered by reference to the provisions of the contract, explained and supplemented by the testimony which has been referred to. The contract provides for sales of goods, to be shipped from another State into this State and to be set up, or installed, here. But it does more.

It contemplates the maintenance, within the State, of an agency of the plaintiff, for the purpose of examining, repairing, and replacing the goods sold, for an indefinite period of time. Such an agency was maintained. It is not the case of a single transaction, within the State, accompanying or merely incidental to the business of selling goods and installing or setting them up for use, but is the case of conducting, within the State, a regular and continuous business in aid and furtherance of the general business of the plaintiff, and the business so carried on, within the State, is not, or was not, interstate in nature. The facts disclosed distinguish the case and that of *International Textbook Co.* v. *Pigg*, 217 U. S. 91 (30 Sup.

165 MICH.—39.

Ct. 481, 27 L. R. A. [N. S.] 493), and the decision of the trial court is supported by *Haughton Elevator, etc., Co. v. Candy Co.*, 156 Mich. 25 (120 N. W. 18); *Imperial Curtain Co.* v. *Jacob*, 163 Mich. 72 (127 N. W. 772). It is unnecessary to consider whether there was sufficient evidence of the right of plaintiff to control and enforce the demand sued upon.

The judgment is affirmed.

BIRD, HOOKER, MOORE, and McALVAY, JJ., concurred.