LONG MANUFACTURING COMPANY, INC v WRIGHT-WAY
FARM SERVICE, INC

1. CORPORATIONS.—LONG-ARM STATUTES—INTRASTATE ACTIVITIES—
   FOREIGN CORPORATIONS.

   The expansive interpretation of the long-arm jurisdiction statutes
   is not a proper guide for determining what intrastate activities
   constitute carrying on its business by a foreign corporation
   requiring procurement of a certificate of authority; the policy,
   purpose, and history of these statutes differ substantially
   (MCLA 450.93, 600.705[1], 600.715[1], 600.735[1]).

2. COMMERCE—STATE—INTERSTATE ACTIVITY—FORUM—COURTS—DAM-
   AGES—NONRESIDENTS.

   The public policy favoring commerce between the states, necessi-
   tating the imposition of limitations on state regulation of
   interstate activity, is entirely consistent with a policy of allow-
   ing a state to provide its citizens with a forum in local courts to
   seek damages resulting from transactions with nonresidents;
   both policies have this in common: they ultimately favor the
   consumer.

3. CORPORATIONS—FOREIGN CORPORATIONS—DOING BUSINESS—STAT-
   UTES.

   The statutory foreign corporation qualification requirements do
   not prohibit the transaction of *any* business in the state but
   only forbids the *carrying on* of the business of the corporation
   in the state (MCLA 450.93).

4. CORPORATIONS—INTRASTATE ACTIVITIES—ISOLATED ACTIVITIES—DO-
   ING BUSINESS—FOREIGN CORPORATIONS.

   Since isolated or independent intrastate activities, unless evidenc-
   ing an intention to carry on the corporate business within the
   state, do not require a corporation first to qualify to do busi-
   ness, a North Carolina corporation's participation in negotia-

REFERENCES FOR POINTS IN HEADNOTES
[1] 36 Am Jur 2d, Foreign Corporations §§ 365–367.
[2] 36 Am Jur 2d, Foreign Corporations §§ 487, 490.
[3–8] 36 Am Jur 2d, Foreign Corporations §§ 10–17, 52, 193–232, 272,
   316–368.

tions between its Michigan dealer and the dealer's customer did not subject the corporation to the Michigan foreign corporation qualification requirements where it was the first and only time that the corporation had become involved in a Michigan dealer's negotiation with a prospective customer.

5. CORPORATIONS—FOREIGN CORPORATIONS—INTERSTATE COMMERCE—SALES.

There are some continuous activities in which a foreign corporation may engage locally without domesticating; it may be relieved from compliance with state statutes if the business is interstate and the taking of orders in one state for goods to be shipped from another or the shipment of such goods in the channels of interstate commerce does not subject a foreign corporation to statutes requiring such corporations to qualify before carrying on their business locally; thus, a North Carolina corporation would not be required to qualify in Michigan before making an "interstate" sale to one of its dealers even though one of its employees came into Michigan to obtain the order and, if the corporation made a sale to a Michigan customer in its dealer's name, such a direct sale would also be an interstate sale.

6. CORPORATIONS—INTRASTATE SALE—DOING BUSINESS.

Activities of an agent of a North Carolina corporation in bringing about one intrastate sale in Michigan, being isolated, non-continuous, non-systematic, did not amount to carrying on, or evidence an intention on the corporation's part to carry on, its business in Michigan where it maintained no office in Michigan and had no full or part-time employee regularly engaged in promoting intrastate purchases by Michigan·retailers or residents from its dealers.

7. CORPORATIONS—INDEPENDENT CONTRACTORS—DOING BUSINESS.

North Carolina corporation's agent's placing of two Ohio independent contractors in communication with a Michigan dealer and a Michigan customer does not support a finding that the North Carolina corporation installed, or even participated actively in the installation and erection of equipment, and it certainly does not constitute the carrying on of business by that corporation in Michigan.

8. CORPORATIONS—ISOLATED REPAIR ACTIVITY—DOING BUSINESS.

The isolated repair activity by a North Carolina corporation on equipment it sold to its Michigan dealer did not constitute the carrying on, or indicate an intention to carry on, a regular and

continuous business where at no time did it contract with its
Michigan dealer or that dealer's customer to repair or maintain
equipment, it does not employ repairmen and it is not its
practice nor part of its business to repair the equipment which
it sells.

Appeal from Court of Appeals, Division 3, Fitz-
gerald, P. J., and R. B. Burns and Holbrook, JJ.,
affirming Cass, James E. Hoff, J. Submitted Janu-
ary 8, 1974. (No. 5 January Term 1974, Docket No.
54,143.) Decided February 14, 1974.

39 Mich App 546 reversed.

Complaint by Long Manufacturing Company,
Inc., against Wright-Way Farm Service, Inc., for
the purchase price of goods and services. Acceler-
ated judgment for defendant. Plaintiff appealed to
the Court of Appeals. Affirmed. Plaintiff appeals.
Reversed and remanded for trial.

*Phillipson & Boezeman,* for plaintiff.

*O'Connor & Feldman,* for defendant.

LEVIN, J. Long Manufacturing Company, Inc., a
North Carolina corporation, commenced this ac-
tion against Wright-Way Farm Service, Inc. to
recover the purchase price of goods and services.

The trial judge granted Wright-Way's motion for
accelerated judgment[1] on the ground that Long
lacked the capacity to maintain the action because
its transactions with Wright-Way constituted "do-
ing business" in Michigan and Long did not pos-

---

[1] The trial judge, interpreting Long's motion for dismissal of the
complaint as a motion for accelerated judgment, ordered an immedi-
ate trial to resolve the disputed factual issue of whether Long "was
doing business" in Michigan. *See* GCR 1963, 116.3, 505.2

sess a certificate authorizing it as a foreign corporation to "carry on its business" in Michigan.[2]

The Court of Appeals, in a per curiam opinion, affirmed the trial court's conclusion that the sued-upon "transaction was not a mere sale and shipment of goods in interstate commerce, but resulted in the actual doing of business in Michigan contrary to MCLA 450.93; MSA 21.94." 39 Mich App 546, 549; 197 NW2d 862 (1972).

We reverse. Long's sale to Wright-Way was in interstate commerce. Long's activities in Michigan were incidental to that sale. Long was not "carry-[ing] on its business" in Michigan and was not subject to the foreign corporation qualification requirements of MCLA 450.93; MSA 21.94.[3]

I

In holding that Long was "doing business" in Michigan, both the circuit judge and the Court of Appeals relied on *Dobson v Maytag Sales Corp,* 292 Mich 107, 111; 290 NW 346 (1939). In *Dobson,* this Court concluded that the defendant foreign corporation was "doing business [in Michigan] in such a sense as to make it amenable to the jurisdiction of the courts of the State". The Court stated, however, that the analysis for jurisdictional

---

[2] MCLA 450.93; MSA 21.94 makes it "unlawful for any foreign corporation to carry on its business in this state, until it shall have procured from the Michigan corporation and securities commission a certificate of authority for that purpose".

MCLA 600.2021; MSA 27A.2021 provides that a foreign corporation may not "maintain any action" founded upon or arising out of any act which is forbidden.

[3] There is, thus, no need to consider Long's alternative contention that § 1051 (MCLA 450.2051[1]; MSA 21.200[1051][1]) of the new Business Corporation Act, effective January 1, 1973, permits a previously unauthorized foreign corporation to prevent dismissal of an action by obtaining a certificate of authority which, Long asserts, it has obtained.

purposes was "not to be determined by the tests applicable under statutes such as those prescribing the conditions under which a foreign corporation may be allowed to do business within the State. Activities insufficient to make out the transaction of business under such statutes may yet be sufficient to bring the corporation within the State so as to make it amenable to process."

The expansive interpretation of the long-arm jurisdiction statutes[4] is not a proper guide for determining what intrastate activities constitute "carry[ing] on its business" by a foreign corporation requiring procurement of a certificate of authority.[5] "The policy, purpose, and history of these statutes differ substantially". *Riblet Tramway Co v Monte Verde Corp,* 453 F2d 313, 317 (CA 10, 1972).[6]

The United States Supreme Court has considered the propriety of a state requiring a foreign corporation to domesticate before carrying on its business in terms of the Commerce Clause; while the long-arm statutes have been thought to raise

---

[4] *See Sifers v Horen,* 385 Mich 195; 188 NW2d 623 (1971); *Schneider v Linkfield,* 389 Mich 608; 209 NW2d 225 (1973).

[5] MCLA 600.705(1), 600.715(1), 600.735(1); MSA 27A.705(1), 27A.715(1), 27A.735(1), enable Michigan courts to exercise limited personal jurisdiction over nonresident individuals, corporations and partnerships who have "transact[ed] any business within the state." *See Sifers v Horen, supra.* In contrast, the foreign corporation qualification statute has not been "construed as prohibitive of transacting *any* business in the State". (Emphasis by the Court.) *Electric Railway Securities Co v Hendricks,* 251 Mich 602, 605; 232 NW 367 (1930), quoted more fully in text preceding fn 7.

[6] The factors for determining the necessity for domestication under the new Business Corporation Act do "not apply in determining the contracts or activities which may subject a foreign corporation to service of·process or taxation in this state." MCLA 450.2012(2); MSA 21.200(1012)(2).

*See Eli Lilly & Co v Sav-On-Drugs, Inc,* 366 US 276; 81 S Ct 1316; 6 L Ed 2d 288 (1961), *rehearing denied* 366 US 978; 81 S Ct 1913; 6 L Ed 2d 1268 (1961), Douglas, J.

*See also,* Comment, *The Lilly Case: Dictum, Holding, and Finding,* 57 NW U L Rev 306 (1962).

questions under the Due Process Clause. The pub-
lic policy favoring commerce between the states,
necessitating the imposition of limitations on state
regulation of interstate activity, is entirely consist-
ent with a policy of allowing a state to provide its
citizens with a forum in local courts to seek dam-
ages resulting from transactions with nonresi-
dents. Both policies have this in common: they
ultimately favor the consumer.

## II

Long sells its merchandise, manufactured in
North Carolina, through a national sales organiza-
tion. Its traveling salesmen solicit orders for unas-
sembled farm and related machinery and equip-
ment from wholesalers and retailers who, pursu-
ant to agreements, have become Long "dealers".
As both Long salesmen and the managers of their
district sales headquarters lack the authority to
bind Long contractually, the solicited orders, being
mere offers, are sent to North Carolina for accept-
ance or rejection. If the order is accepted, the
machinery and equipment is shipped to the dealer.

Long's Michigan operations are limited to the
solicitation of orders by its salesmen. It has nei-
ther an office nor inventory in this state.

In this case the ultimate purchaser was C. J.
Williams, a manager of a farm. He inquired about
purchasing grain handling equipment from
Wright-Way, a Long dealer. Wright-Way's commu-
nications with a Long salesman caused R. W.
Strickland, Long's district sales manager, to come
from Ohio to Wright-Way's office in Michigan to
discuss the prospective sale. In the words of the
circuit judge, Strickland " 'took over' " the discus-
sions "in no uncertain terms." He accompanied

Arthur Scott, Wright-Way's vice-president and general manager, to Williams' farm, made suggestions regarding the equipment and where it should be located, and presented Wright-Way with a quotation of dealer list prices to offer Williams.

Scott and Williams, after negotiating further between themselves about possible discounts from the list price, agreed upon a final price. Scott and Strickland then returned to Wright-Way's office where Strickland prepared Wright-Way's order from Long. Scott signed the order and Strickland forwarded it to North Carolina where it was approved. The equipment was later shipped into Michigan from Iowa. Strickland's "taking over" the negotiations between Wright-Way and Williams made it "quite clear" to the circuit judge that Long had made the "sale itself (albeit in its dealer's name)."

The statute does not prohibit the transaction of *"any* business in the State" but only forbids "the *carrying on* of the business of the corporation in this State." *Electric Railway Securities Co v Hendricks,* 251 Mich 602, 605; 232 NW 367 (1930). (Emphasis by the Court.) Thus, "[i]t is not every act or transaction of a foreign corporation in the state that will bring it within the operation of laws imposing conditions on its right to do business in the state. The thing done must be of a character indicative of an intention on the part of the corporation to carry on its business in the state.[7] There is implied in the term 'doing business' a continuity of act and purpose." 17 Fletcher

---

[7] "It is true that a single transaction may disclose the purpose of a corporation to carry on its business in the State, but such a transaction must be something more than an independent or isolated transaction, not necessarily of a character to indicate a purpose to engage in the carrying on of the corporate business in the State." *Electric Railway Securities Co v Hendricks, supra,* p 605.

Cyclopedia Corporations (1960 rev ed), § 8466, pp 554–555.

It appears that this was the first and only time that Long had become involved in a Michigan dealer's negotiation with a prospective customer. Since 'isolated or independent intrastate activities, unless evidencing an intention to carry on the corporate business within the state, do not require a corporation first to qualify to do business, Long's participation in the negotiations between Wright-Way and Williams did not subject Long to the Michigan foreign corporation qualification requirements.[8]

There are even some continuous activities in which a foreign corporation may engage locally without domesticating. "[I]t may be relieved from compliance with state statutes if the business is interstate."[9] The United States Supreme Court has said that "the taking of orders in one State for goods to be shipped from another or the shipment of such goods in the channels of interstate commerce" does not subject a foreign corporation to

---

[8] *See C H Knight-Thearle Co v Hartline,* 233 Mich 53; 206 NW 547 (1925); *Electric Railway Securities Co v Hendricks, supra; National Adjusting Ass'n v Dallavo,* 253 Mich 239; 234 NW 485 (1931); *Dur-Ram Packaging Devices, Ltd v Self-Seal Containers, Inc of Michigan,* 18 Mich App 81; 170 NW2d 473 (1969).

Section 1012(1)(j) of the new Business Corporation Act codifies this rule: "[c]onducting an isolated transaction not in the course of a number of repeated transactions of like nature" does not, by itself, constitute "transacting business" by a foreign corporation. MCLA 450.2012(1)(j); MSA 21.200(1012)(1)(j).

The portions of § 1012 of the Business Corporation Act quoted in this footnote and footnotes 9 and 10 repeat the wording of § 106, 2d Par, Model Business Corporation Act; this language has been adopted in at least a dozen other states, see Model Business Corporation Act Annotated (2d ed), including 1973 supplement.

[9] 17 Fletcher Cyclopedia Corporations (1960 rev ed), § 8403, p 311.

"Transacting any business in interstate commerce" is one of the activities in Michigan allowed an unauthorized foreign corporation under the new Business Corporation Act. MCLA 450.2012(1)(i); MSA 21.200(1012)(1)(i).

statutes requiring such corporations to qualify before carrying on their business locally.[10]

"The mere negotiations of sales of goods which require transportation from outside the state constitute interstate commerce, and hence state statutes as to admission of foreign corporations do not apply to the acts of agents of a foreign corporation in soliciting, receiving and transmitting orders for such goods. It is

---

[10] *Browning v Waycross,* 233 US 16, 19–20; 34 S Ct 578; 58 L Ed 828 (1914).

*Similarly, see,* 17 Fletcher Cyclopedia Corporations (1960 rev ed), § 8409, pp 331–332, which after noting that this principle is "so well settled" cites "only a few of the hundreds of decisions so holding".

Among the Michigan cases are *Imperial Curtain v Jacob,* 163 Mich 72, 76; 127 NW 772 (1910); *Coit & Co v Sutton,* 102 Mich 324, 326; 60 NW 690 (1894); *People v Bunker,* 128 Mich 160; 87 NW 90 (1901); *Standard Fashion Co v Cummings,* 187 Mich 196; 153 NW 814 (1915). *See Transit Bus Sales v Kalamazoo Coaches,* 145 F2d 804, 807 (CA 6, 1944) (construing the Michigan statute).

*Contrast Despres, Bridges & Noel v Zierleyn,* 163 Mich 399, 402–403; 128 NW 769 (1910), which illustrates the dividing line between interstate and intrastate sales. In *Despres* the foreign corporation's salesmen carried their merchandise in the trunks of their automobiles and contracted for and simultaneously delivered their goods to Michigan customers:

"It was not the case of a foreign corporation shipping goods in an original package to the domestic State, because these goods were brought into the State in bulk, to be sold by its agents, in such quantities as the purchaser desired. It was not the case of a sale of goods by sample, in the domestic State, by a foreign corporation, through itinerant salesmen, because the goods were not only sold, but were delivered at the same time. It was not the case of a foreign corporation placing its goods in the hands of a local merchant, to be sold on commission; but it was a case of a foreign corporation coming into this State, by its agents, who brought with them a small stock of goods, with the expectation that their customers would purchase them. The goods were brought into the State in bulk and became a part of the mass of the property of this State as soon as they arrived and were offered for sale. The exhibition of them, the offer to sell, the sale, and the delivery of the goods, all took place within this State. Tested by the rules by which it is usually determined whether commerce is interstate, none of them brings plaintiff's methods of selling goods within the protection of interstate commerce."

"Soliciting or procuring orders, whether by mail or through employees or agents or otherwise, where such orders require acceptance without this state before becoming binding contracts" is one of the activities a foreign corporation may carry on in Michigan without procuring a certificate of authority under the new Business Corporation Act. MCLA 450.2012(1)(f); MSA 21.200(1012)(1)(f).

immaterial whether the orders are taken by residents
or non residents, or from consumers or dealers." 17
Fletcher Cyclopedia Corporations (1960 rev ed), § 8409,
pp 338–339.[11]

Thus, Long was not required to qualify in Michi-
gan before making an "interstate" sale to one of
its dealers (Wright-Way) even though one of its
employees (Strickland) came into Michigan to ob-
tain the order.

If, as the circuit judge found, Long made the
"sale itself (albeit in its dealer's name)" *to Wil-
liams,* such a direct sale would also be an inter-
state sale.

In *Eli Lilly & Co v Sav-On-Drugs, Inc,* 366 US
276, 278; 81 S Ct 1316; 6 L Ed 2d 288 (1961),
rehearing denied 366 US 978; 81 S Ct 1913; 6 L Ed
2d 1268 (1961), the United States Supreme Court,
in its most recent expression, said that while
"[u]nder the authority of the so-called 'drummer'
cases * * * Lilly is free to send salesmen into New
Jersey to promote this interstate trade without
interference from regulations imposed by the
State", it was engaged in intrastate commerce in
New Jersey because it maintained an office in
Newark with 18 promotion men whose function
was to induce retailers to purchase from wholesal-
ers who in turn dealt with Lilly.

Here, in contrast, Long maintained no office in

[11] In *Despres, Bridges & Noel v Zierleyn, supra,* discussed in fn 10,
the foreign corporation's salesmen also solicited orders from consum-
ers for goods not carried into Michigan. The orders were forwarded to
plaintiff's out-of-state corporate headquarters and the goods shipped
directly to the consumers. This aspect of the plaintiff's business was
held to be interstate commerce.

*See, also, Real Silk Hosiery Mills v Portland,* 268 US 325; 45 S Ct
525; 69 L Ed 982 (1925), where the Court held that a foreign corpora-
tion's "house to house" salesmen who solicited and accepted orders
"throughout the United States [from] consumers only" were engaged
solely in interstate commerce.

Michigan and had no full or part-time employee
regularly engaged in promoting intrastate pur-
chases by Michigan retailers or residents from
Long dealers. Whatever Strickland's involvement
in the negotiations culminating in Wright-Way's
sale to Williams, his activities in bringing about
that one intrastate sale, being "isolated", non-
"continuous", non-"systematic", did not amount to
carrying on, or evidence an intention on Long's
part to carry on, its business in Michigan.

### III

The trial judge also found that Long was re-
quired to qualify in Michigan because it "partici-
pated actively in the installation and erection of
the equipment", and, when the installation proved
defective, Strickland "made contact with a differ-
ent contractor named Veil who was put on the job
to redo or do right the work the original contrac-
tor Stubbs had done wrong."

A foreign corporation which contracts to erect or
install or supervise the erection or installation of
machinery and equipment which it has sold and
shipped to a state may under some circumstances
subject itself to local qualification requirements.[12]

---

[12] The United States Supreme Court has indicated that the question
whether an interstate seller engages in intrastate commerce by
simultaneously contracting to and actually installing the machinery
which it has sold turns on whether "because of some intrinsic and
peculiar quality or inherent complexity of the article, the making of
such agreement was essential to the accomplishment of the interstate
transaction." *Browning v Waycross,* 233 US 16, 23; 34 S Ct 578; 58 L
Ed 828 (1914). *See York Manufacturing Co v Colley,* 247 US 21; 38 S
Ct 430; 62 L Ed 963; 11 ALR 611 (1918); 17 Fletcher Cyclopedia
Corporations (1960 rev ed), § 8412.

Michigan case law appears to adopt this approach: "[T]he vital
question upon this point is whether the installing of [the machinery]
by plaintiff was such an essential requisite to the sale of them that it
can be said that but for the installation by the plaintiff it could make
no sale." *Power Specialty Co v Michigan Power Co,* 190 Mich 699,
715; 157 NW 408 (1916); *B F Sturtevant Co v Adolph Leitelt Iron*

We need not consider the intricate case law concerning such transactions because, quite simply, Long did not contract with Williams to, nor did it actually install the grain bins for Williams. It merely arranged for installation contractors to communicate with Wright-Way and Williams; subsequently Williams entered into separate contracts with installers.

These arrangements were made after Wright-Way and Williams informed Strickland that neither knew a contractor who could install the equipment and asked him to suggest the name of a contractor. Strickland agreed and made several phone calls. When Eddie Stubbs, an Ohio contractor, expressed an interest, Strickland took the plans and cost projections to Long's office in Ohio where Stubbs examined them.

Stubbs expressed a desire to take the job, and Strickland told him to communicate with Wright-Way. Stubbs eventually contracted with Williams and installed the grain bins. Long was not a party to this contract. Stubbs was not an employee or agent of Long, but an independent contractor who had previously done business with Long. No employee of Long either supervised or aided in Stubbs' installation of the equipment.

When Wright-Way and Williams became dissatisfied with Stubbs' installation, they requested Strickland to suggest another installer to remedy the apparent defects. Strickland described the job to another Ohio contractor, C. W. Veil. Upon Veil's request, Strickland accompanied him to Williams' farm to discuss the matter with Wright-Way and Williams.

---

*Works,* 196 Mich 552; 163 NW 13 (1917); *Decorators Supply Co v Chaussee,* 211 Mich 302; 178 NW 665 (1920); *Moline Furniture Works v Club Holding Co,* 280 Mich 587; 274 NW 338 (1937). *See, also. Smilansky v Mandel Bros,* 254 Mich 575, 583; 236 NW 866 (1931).

Subsequently, outside of Strickland's presence and apparently even without his knowledge, Veil entered into a contract signed by both Wright-Way and Williams—payment to be made by Williams—to do the necessary alterations. Once again the record fails to indicate that any Long employee was in any way connected with Veil's work.

Strickland's placing of Stubbs and Veil in communication with Wright-Way and Williams does not support the finding that Long installed, or even "participated actively in the installation and erection of the equipment," and it certainly does not constitute the "carry[ing] on of business" by Long in Michigan.

## IV

In finding that Long's involvement in Wright-Way's sale constituted doing business in Michigan, the judge also noted that Strickland had "arranged to have a defect in the nature of a bow in the leg of an elevator corrected by one Lavern Crawford".

As previously mentioned, while the taking of orders in one state for goods to be shipped from another is regarded as interstate commerce, regular and continuous activity ordinarily does subject a foreign corporation to domestication requirements. Accordingly, just as a foreign corporation which contracts to install may subject itself to such requirements, so, too, may a foreign corporation which contracts to repair or maintain its products subject itself to such requirements. The isolated repair activity in this case did not, however, constitute the carrying on, or indicate an

intention to carry on, a regular and continuous business.[13]

At no time did Long contract with Wright-Way or with Williams to repair or maintain the equipment. Long does not employ repairmen. It is not its practice nor part of its business to repair the equipment which it sells.

Strickland visited the farm in response to Williams' complaints, observed that there was a bow in a leg of the equipment, and agreed that "a man [Crawford]" who he had "coming through * * * would stop and tighten the cables or whatever was necessary to get the bow out." Crawford, a warehouseman "responsible for keeping the inventory in the proper place," made a relatively small repair.

Reversed and remanded for trial.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, SWAINSON, WILLIAMS, and M. S. COLEMAN JJ., concurred with LEVIN, J.

J. W. FITZGERALD, J., did not sit in this case.

---

[13] *See Nernst Lamp Co v Conrad,* 165 Mich 604, 609; 131 NW 120 (1911); *Haughton Elevator & Machine Co v Detroit Candy Co,* 156 Mich 25; 120 NW 18 (1909); *Imperial Curtain Co v Jacob,* 163 Mich 72; 127 NW 772 (1910); *Transit Bus Sales v Kalamazoo Coaches,* 145 F2d 805, 807–808 (CA 6, 1944).